**LIBRARY OF CONGRESS, Petitioner,**

v.

**FEDERAL LABOR RELATIONS AUTHORITY, Respondent.**

**No. 82–1240.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 15, 1982.

Decided Feb. 25, 1983.

John S. Koppel, Atty., Dept. of Justice, Washington, D.C., with whom William Kanter, Atty., Dept. of Justice, Washington, D.C., was on the brief, for petitioner. Frederick Geilfuss, Atty., Dept. of Justice, Washington, D.C., entered an appearance for petitioner.

William E. Persina, Atty., Federal Labor Relations Authority, Washington, D.C., with whom Steven H. Svartz, Atty., Federal Labor Relations Authority, Washington, D.C., was on the brief, for respondent.

Mary Elizabeth Medaglia, Atty., Federal Labor Relations Authority, Washington, D.C., entered an appearance for respondent.

Before WRIGHT, TAMM, and WALD, Circuit Judges.

Opinion for the court filed by Circuit Judge WRIGHT.

J. SKELLY WRIGHT, Circuit Judge:

Petitioner Library of Congress (Library or agency) seeks review of an order of the Federal Labor Relations Authority (Authority or FLRA) determining that six union bargaining proposals come within the scope of the Library's duty to bargain under Title VII of the Civil Service Reform Act of 1978 (the Act).[1] The Library contends that the proposals are nonnegotiable because they pertain to matters over which the Architect of the Capitol (Architect), not the Library, has exclusive statutory control. The Authority found that the Library must nevertheless negotiate about the proposals because it has discretion to make recommendations to the Architect. Since the Authority's decision is consistent with the Act and its legislative history, with analogous private sector case law, and with important considerations of public policy, we enforce in full the Authority's order.

I. FACTUAL AND PROCEDURAL BACKGROUND

In mid-1979 the Library announced that the newly constructed James Madison Memorial Building would open for employee occupancy in December of that year and that eventually about 80 percent of the Library employees would be housed in the new building. Four unions[2] representing employees involved in the move submitted to the Library collective bargaining proposals which dealt with the changes in working conditions created by the relocation. Among these union proposals were the following:

---

1. Title VII of the Civil Service Reform Act of 1978, Pub.L. No. 95–454, Title VII, 92 STAT. 1191 (1978) is commonly known as the Federal Labor-Management Relations Act and is codified at 5 U.S.C. § 7101 et seq. (Supp. V 1981).

2. These unions were Local 2477 and Local 2910 of the American Federation of State, County & Municipal Employees, AFL–CIO; the Congressional Research Employees Association; and the Law Library of Congress United Association of Employees.

*Union Proposal XI*

Each employee in the Inquiry Section will be situated in such a way as to minimize the distractions to employees from telephone calls.

*Union Proposal XII*

All corridors shall conform to the D.C. fire code and federal regulations.

*Union Proposal XIII*

No employee will be required to perform work in areas which violate appropriate NFPA Safety Codes, or which violate the recommendations of the 1973–74 FIRE-PRO report on fire safety in the Madison Building.

*Union Proposal XIV*

To insure quiet and efficient working conditions each analyst's office will be equipped with a door.

*Union Proposal XV*

To insure quiet and efficient working conditions all two-person offices will have floor to ceiling partitions dividing the office.

*Union Proposal XVI*

Ten showers for men and ten showers for women will be provided in an area accessible from the rear loading areas. Sixty lockers suitable for temporary clothing storage will be provided in a space adjacent to the shower area.[3]

The Library contended that it had no duty to bargain with respect to these and other collective bargaining proposals. The unions responded to this refusal to bargain by filing a negotiability appeal with the Authority. The Library in turn provided a statement of reasons for its determination of nonnegotiability, claiming that it could not bargain as to the above proposals because they involved matters relating to the structure of the new building and were thereby entrusted to the exclusive discretion of the Architect pursuant to 2 U.S.C. § 141 (1976 & Supp. V 1981).[4]

On January 7, 1982 the Authority issued its decision holding the union proposals to be bargainable. The Authority found that while the Library does not have actual statutory authority to implement the proposals, it does have the practical discretion to recommend structural alterations to the Architect. In documents submitted to the Authority, the Library conceded that it has made such recommendations in the past and that "in practice the Librarian has consulted with the Architect extensively" on these matters.[5] The Authority therefore held that since the proposals related to matters affecting employees' working conditions, the Library was obligated to bargain about the proposed changes to the extent of this discretion.[6] In other words, the Library's statutory duty to bargain was found to encompass a duty to negotiate over the

---

3. *See* brief for petitioner at 3–4, brief for respondent at 7.

4. The pertinent provision of 2 U.S.C. § 141 (1976) reads:

§ 141. Duties of Architect of the Capitol and Librarian of Congress

The Architect of the Capitol shall have charge of all structural work at the Library Building and on the grounds, including all necessary repairs, the operation, maintenance, and repair of the mechanical plant and elevators, the care and maintenance of the grounds, and the purchasing of all equipment other than office equipment. The employees required for the performance of the foregoing duties shall be appointed by the Architect of the Capitol. All other duties on June 29, 1922, required to be performed by the Superintendent of the Library Building and Grounds shall be performed under the direction of the Librarian of Congress, who shall appoint the employees necessary therefor. The Librarian of Congress shall provide for the purchase and supply of office equipment and furniture for library purposes.

5. *American Federation of State, County & Municipal Employees, AFL–CIO, Local 2477, and Library of Congress, Washington, D.C.,* 7 FLRA No. 89 at 9 (1982) (*quoting from* attachments to Library's statement of position).

6. The Authority also explicitly found that the union proposals were not otherwise inconsistent with any federal law or regulation. *See id.* at 9, 11.

content of any recommendations made to the Architect concerning these matters.[7]

On September 17, 1982 the Library filed this petition for review, seeking to have the Authority's decision set aside on the ground that it engendered a radical expansion of the scope of mandatory collective bargaining fundamentally inconsistent with both the Act and analogous labor relations precedent in the private sector. The Authority subsequently filed a cross-application for enforcement of its decision ordering the Library to negotiate with the unions on the proposals.

## II. Statutory Scheme

Enacted in 1978, the Act comprehensively reorganized the structure of labor-management relations in the federal government.[8] Congress intended the new statutory system to serve the twin goals of protecting the right of public employees to organize and bargain collectively, while simultaneously strengthening the authority of federal management to hire and fire employees in the interest of a more effective public service.[9] The independent and bipartisan FLRA was established to administer and formulate policies under the Act, performing a role quite analogous to that of the National Labor Relations Board (NLRB) in the private sector.[10] Among its powers, the FLRA has authority to determine appropriate bargaining units,[11] to supervise representational elections,[12] to hear and resolve complaints of unfair labor practices,[13] and— most crucial to this case—to resolve issues relating to the duty to bargain in good faith.[14]

The Act also establishes a collective bargaining system for federal employees. Under this system, federal agencies have a duty to engage in collective bargaining,[15] which is defined as "the performance of the mutual obligation of the representative of an agency and the exclusive representative of employees * * * to consult and bargain in a good-faith effort to reach agreement with respect to the conditions of employ-

---

**7.** The Library had also argued before the Authority that these proposals involved the "technology * * * of performing work" within the meaning of 5 U.S.C. § 7106(b)(1) (Supp. V 1981), and were therefore negotiable only at the election of the agency. The Authority rejected this argument, and the Library does not raise it in its petition for review.

**8.** For more extensive treatment of the history and requirements of the Act, *see Nat'l Treasury Employees Union v. FLRA,* 691 F.2d 553, 554–555 (D.C.Cir.1982); *U.S. Dep't of Agriculture v. FLRA,* 691 F.2d 1242, 1243–1245 (3d Cir.1982); *Dep't of Defense v. FLRA,* 659 F.2d 1140, 1144–1147 (D.C.Cir.1981), *cert. denied sub nom. AFGE v. FLRA,* 455 U.S. 945, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982).

**9.** The Act's declaration of findings and purposes includes the following:

(a) The Congress finds that—

(1) experience in both private and public employment indicates that the statutory protection of the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them—

(A) safeguards the public interest,

(B) contributes to the effective conduct of public business, and

(C) facilitates and encourages the amicable settlements of disputes between employees and their employers involving conditions of employment; and

(2) the public interest demands the highest standards of employee performance and the continued development and implementation of modern and progressive work practices to facilitate and improve employee performance and the efficient accomplishment of the operations of the Government.

Therefore, labor organizations and collective bargaining in the civil service are in the public interest.

5 U.S.C. § 7101 (Supp. V 1981).

**10.** *See* 29 U.S.C. § 151 *et seq.* (1976). This analogy between the Authority and the NLRB has been explicitly accepted by this court. *See, e.g., Turgeon v. FLRA,* 677 F.2d 937, 939 (D.C. Cir.1982) *(per curiam); Dep't of Defense v. FLRA, supra* note 8, 659 F.2d at 1144.

**11.** 5 U.S.C. § 7105(a)(2)(A) (Supp. V 1981).

**12.** *Id.* § 7105(a)(2)(B).

**13.** *Id.* § 7105(a)(2)(G).

**14.** 5 U.S.C. § 7105(a)(2)(E) provides that the Authority shall "resolve[ ] issues relating to the duty to bargain in good faith under section 7117(c) of this title[.]"

**15.** *See* 5 U.S.C. § 7114(a)(4) and (b)(2) (Supp. V 1981); *id.* § 7117(a)(1).

ment affecting such employees * * *." 5 U.S.C. § 7103(a)(12) (Supp. V 1981). The term "conditions of employment" is in turn broadly defined by the Act to include "personnel policies, practices, and matters, whether established by rule, regulation, or otherwise, affecting working conditions * * *." Id. § 7103(a)(14). Expressly excluded from this general obligation to bargain about conditions of employment are policies, practices and matters which are "specifically provided for by Federal statute[.]" Id. § 7103(a)(14)(C).[16]

Typically, disputes over negotiability arise when the union submits to the agency a proposal to be included in a collective bargaining agreement. If the agency believes that the proposal does not come within its duty to bargain, it may refuse to negotiate on that basis. The union then has a right to appeal the agency's refusal to the Authority.[17] The Authority then decides whether the statutory duty to bargain extends to the disputed matter, providing a written decision with specific reasons for sustaining or setting aside the agency's original determination of nonnegotiability.[18] If the Authority finds the proposal to be negotiable, it simply orders the agency to bargain in good faith; it neither addresses the merits of the proposal nor orders the agency to agree to the proposal.

## III. ANALYSIS

Petitioner Library makes two basic arguments in urging this court to set aside the decision of the Authority that the disputed union proposals are bargainable. First, the Library contends that matters beyond the control of the agency cannot be deemed "conditions of employment" within the meaning of the Act and so are not mandatory subjects of collective bargaining. As principal support for this argument, the Library relies on the leading private sector case addressing the bargaining status of matters beyond exclusive employer control, Ford Motor Co. v. NLRB, 441 U.S. 488, 99 S.Ct. 1842, 60 L.Ed.2d 420 (1979). The Library also asserts that the Authority's decision cannot be reconciled with the statutory admonition to interpret the provisions of the Act "in a manner consistent with the requirement of an effective and efficient government." 5 U.S.C. § 7101(b) (Supp. V 1981). After careful examination of the statutory language and history, private sector precedent, and policy considerations, we conclude that the Library's arguments fail and that the Authority's decision must be upheld.

### A. Standard of Review

We begin our review of this case mindful of the limited character of our inquiry. Congress has clearly delegated to the Authority the responsibility in the first instance to construe the Act and to determine whether a proposal comes within the statutory duty to bargain.[19] The Act provides that judicial review of FLRA decisions "shall be on the record in accordance with section 706 of this title." 5 U.S.C. § 7123(c) (Supp. V 1981). Section 706 of Title V in turn requires us to "hold unlawful and set aside agency action, findings, and conclusions found to be * * * arbitrary, capri-

---

**16.** The Act's expansive duty to bargain is subject to several other express exceptions. The most important of these is embodied in the "management rights" clause, § 7106(a), which defines certain rights reserved to management such as the prerogative to select or assign employees. The obligation to negotiate also does not extend to: (1) matters relating to prohibited political activities, see § 7103(a)(14)(A); (2) matters relating to the classification of any position, see § 7103(a)(14)(B); (3) proposals that are inconsistent with any federal law or government-wide rule or regulation, see § 7117(a)(1); and (4) proposals that conflict with an agency rule or regulation for which a

compelling need exists, see § 7117(a)(2). See generally H. ROBINSON, NEGOTIABILITY IN THE FEDERAL SECTOR 11–38 (1981).

**17.** These appeal procedures are detailed in 5 U.S.C. § 7117(c) (Supp. V 1981) and 5 C.F.R. § 2424.1 et seq. (1982). See also Dep't of Defense v. FLRA, supra note 8, 659 F.2d at 1146 & n.35.

**18.** See 5 U.S.C. § 7117(c)(6) (Supp. V 1981); 5 C.F.R. § 2424.10 (1982).

**19.** See 5 U.S.C. §§ 7105(a)(2)(E) and 7117 (Supp. V 1981).

cious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A) (1976).

■ Under this standard, courts will normally give considerable deference to an agency's interpretation of its enabling legislation.[20] Such deference is especially appropriate when, as here, "the administrative practice at stake 'involves a contemporaneous construction of a statute by the [persons] charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new.'"[21] Applying this principle to the Authority's negotiability decisions, this court has recently held that the Authority's construction of its statute will be upheld if it is "reasonably defensible"[22] and if it presents no compelling indications of error.[23]

### B. *Legislative History*

■ With this standard of review in mind, we turn to examine the Library's contention that, as a matter of law, the term "conditions of employment" cannot be construed to encompass matters about which the agency can only make recommen-

dations to a third-party agency with the exclusive authority to act. Neither the terms of the Act itself nor its legislative history lend any direct or indirect support to this assertion. We find that the Authority's more expansive interpretation of the scope of the Library's duty to bargain is fully consistent with the Act's basic purposes and schema.

Congress manifestly established a generalized obligation on an agency to bargain with the exclusive representative of the agency's employees.[24] By its terms, the Act extends the scope of this duty to bargain to include all "conditions of employment"— *i.e.,* to all personnel policies, practices, and matters affecting working conditions.[25] The Act then *expressly* excludes several conditions of employment from this bargaining obligation, such as matters relating to reserved management rights and to certain prohibited political activities.[26] The statutory framework thus may be envisioned as imposing a broadly defined duty to bargain over conditions of employment that is subject only to the express statutory exceptions.[27]

---

20. *See, e.g., Griggs v. Duke Power Co.,* 401 U.S. 424, 433–434, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971); *Udall v. Tallman,* 380 U.S. 1, 4, 85 S.Ct. 792, 795, 13 L.Ed.2d 616 (1965); *Nat'l Federation of Federal Employees v. FLRA,* 652 F.2d 191, 193 (D.C.Cir.1981).

21. *Power Reactor Development Co. v. Int'l Union of Elec., Radio & Mach. Wkrs,* 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961) (*quoting Norwegian Nitrogen Products Co. v. United States,* 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933)).

22. *See Dep't of Defense v. FLRA, supra* note 8, 659 F.2d at 1162 n. 121 ("If the FLRA's construction of the statute is reasonably defensible, we are not free to reject it merely because we might decide differently if confronted with the question in the first instance.") (*citing Ford Motor Co. v. NLRB,* 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979)). *See also Internal Revenue Service v. FLRA,* 671 F.2d 560, 563 (D.C.Cir.1982) (court's review of FLRA's interpretation limited to determination of whether a "rational basis" exists for that interpretation).

23. *See, e.g., Nat'l Treasury Employees Union v. FLRA, supra* note 8, 691 F.2d at 558–559; *Nat'l*

*Federation of Federal Employees v. FLRA, supra* note 20, 652 F.2d at 193 (*quoting Miller v. Youakim,* 440 U.S. 125, 145 n. 25, 99 S.Ct. 957, 969 n.25, 59 L.Ed.2d 194 (1979)). *See also Veterans Admin. Medical Center v. FLRA,* 675 F.2d 260, 262 (11th Cir.1982).

24. *See* 5 U.S.C. § 7114(a)(4) (Supp. V 1981).

25. *See id.* §§ 7114(b)(2) and 7103(a)(14).

26. *See* text at 1284 & note 16 *supra* for a summary of these exceptions.

27. One key proponent of the bill described the express exclusions as "operat[ing] as * * * exception[s] to the general obligation to bargain in good faith over conditions of employment." 124 Cong.Rec. 29198 (1978) (remarks of Rep. W. Ford), *reprinted in* Subcommittee on Postal Personnel and Modernization of the House Committee on Post Office and Civil Service, 96th Cong., 1st Sess., Legislative History of the Federal Service Labor-Management Relations Statute, Title VII of the Civil Service Reform Act of 1978, at 954 (hereinafter referred to as *Legislative History*). *See also* 124 Cong.Rec. 29188 (1978) (remarks of Rep. Clay), *reprinted in Legislative History* at 934.

Certainly, the Act contains no explicit provision that would preclude bargaining over a condition of employment for the sole reason that the employing agency possesses only the power to recommend, and not to implement, any proposed changes. Nor does the legislative history provide any indication that Congress assumed this to be an implicit limitation on the obligation to bargain. Instead, we find Congress' clear, unequivocal statement that "collective bargaining in the civil service is in the public interest." [28] While this expression of general policy alone does not provide a sufficient ground on which the Authority may base a negotiability decision,[29] it is further support for the proposition that, apart from the express exceptions, Congress intended the bargaining obligation to be construed broadly.

Furthermore, we note that the contested proposals involve matters at the very heart of the traditional meaning of "conditions of employment"; few policies and practices could be considered more central to an employee's working conditions than those relating to job safety and office environment.[30] In short, we find nothing in the Act or its legislative history to indicate that the Authority's interpretation of the scope of the duty to bargain is inconsistent with congressional intent or otherwise not reasonably defensible.

### C. *Private Sector Precedent*
#### (1) *Applicability of the private sector model*

The Library's assertion that matters beyond the control of the employing agency do not involve "conditions of employment" rests principally upon an interpretation and application of the leading analogous private sector case, *Ford Motor Co. v. NLRB, supra,* 441 U.S. 488, 99 S.Ct. 1842, 60 L.Ed.2d 420. Reference to private sector precedent decided under the National Labor Relations Act (NLRA)[31] is appropriate in this case. This petition for review represents the first court test of the Authority's position that an agency can be required to bargain to the extent of its limited discretion to make recommendations concerning the contested matters. The lack of any prior judicial decisions under the Act, especially when combined with the relative paucity of applicable legislative history, makes analogies to comparable legal developments in the private sector relevant and useful as a guide for this court's reasoning.

---

**28.** 5 U.S.C. § 7101(a) (Supp. V 1981). This provision also stated that the right to bargain collectively "contributes to the effective conduct of public business" and "facilitates and encourages the amicable settlements of disputes between employees and their employers involving conditions of employment."

**29.** The Library argues that mere generalities evincing congressional support for collective bargaining in the federal sector cannot alone suffice to sustain any particular negotiability decision of the Authority. *See* reply brief for petitioner at 1–2. As support for this contention the Library cites to two recent cases in which the FLRA decisions were reversed despite the fact that the decisions were fully consistent with certain of Congress' general declarations of policy in § 7101 of the Act. *See U.S. Dep't of Agriculture v. FLRA,* 691 F.2d 1242 (8th Cir.1982); *Division of Military & Naval Affairs v. FLRA,* 683 F.2d 45 (2d Cir.1982). These cases are, however, distinguishable from the case at bar since they involved the Authority's interpretation of not only its own Act, but of another statute as well. Thus, the courts properly gave no deference to the Authority's interpretation of a statutory provision not within

its enabling statute. *See* 691 F.2d at 1247; 683 F.2d at 48.

**30.** The six union bargaining proposals dealt with such matters as compliance with fire and safety codes and the arrangement of office space to create a quiet and efficient working environment. *See* text at 1282 *supra.* In the private sector these concerns would clearly come within the meaning of the statutory term. *See, e.g., Fibreboard Paper Products Corp. v. NLRB,* 379 U.S. 203, 222, 85 S.Ct. 398, 409, 13 L.Ed.2d 233 (1964) (Stewart, J., concurring) ("In common parlance, the conditions of a person's employment are most obviously the various physical dimensions of his working environment."). In the federal sector it has at least been acknowledged that employees have a legitimate interest in their health and safety on the job and in their office equipment and furnishings. *See* H. ROBINSON, *supra* note 16, at 81–85, 145–150 (surveying the earlier decisions of the now-defunct Federal Labor Relations Council).

**31.** 29 U.S.C. § 151 *et seq.* (1976).

We take this opportunity, however, to stress that the degree of relevance of private sector case law to public sector labor relations will vary greatly depending upon the particular statutory provisions and legal concepts at issue. This court, for instance, has recently recognized that the structure, role, and functions of the Authority were closely patterned after those of the NLRB and that relevant precedent developed under the NLRA is therefore due serious consideration.[32] The case at bar does not present a comparable congruence. The scope of collective bargaining is far broader in the private sector, and the bargaining status of any given subject is determined by different statutory provisions and by different policy considerations.[33] While these differences do not lead us to eschew completely the private sector model in defining the limits of negotiability in the public sector,[34] we shall be careful to appreciate fully those distinctions between the private and public sectors that might necessitate a different legal analysis and conclusion.

### (2) The Ford Motor decision

The leading case on the negotiability of matters arguably beyond the control of private sector employers is *Ford Motor Co. v. NLRB, supra,* in which the Supreme Court upheld the NLRB's position that prices for in-house cafeteria and vending machine food and beverages constitute "terms and conditions of employment" subject to mandatory collective bargaining under the NLRA.[35] Writing for the Court, Justice White found that the system of in-plant food facilities was clearly both a matter of deep concern to employees [36] and an aspect of the relationship between the company and its employees.[37] He specifically rejected Ford's argument that to require bargaining over the food service prices would be an exercise in futility because the prices were set, not by Ford, but by a third-party supplier. The Court's reasoning was as follows:

> It is true that ARA [the third-party supplier] sets vending machine and cafeteria prices, but under Ford's contract with ARA, Ford retains the right to review and control food services and prices. In any event, an employer can always affect prices by initiating or altering a subsidy to the third-party supplier such as that provided by Ford in this case, and will typically have the right to change suppliers at some point in the future. To this extent the employer holds future, if not present, leverage over in-plant food services and prices.[38]

Petitioner argues for a restrictive reading of this passage. The Library contends that the Court's finding of negotiability is dependent on the substantial amount of "leverage" that Ford could exert vis-a-vis the third-party food supplier. In contrast, the Library asserts that it is "totally powerless" to exercise leverage over the decisions of the Architect; its ability to consult and

---

**32.** *See Turgeon v. FLRA, supra* note 10, 677 F.2d at 939–904; *Dep't of Defense v. FLRA, supra* note 8, 659 F.2d at 1144. *See also Professional Air Traffic Controllers Org. v. FLRA,* 685 F.2d 547, 584 (D.C.Cir.1982) (interpreting scope of the Authority's remedial discretion by looking to Supreme Court interpretation of similar language in the NLRA).

**33.** For example, the exclusion from the scope of federal sector bargaining of matters provided for by federal statute, such as the pay rate or hours of employment, certainly has no private sector counterpart and reflects the peculiarities of the federal government as employer. *See* 5 U.S.C. § 7103(a)(14)(A) (Supp. V 1981); *id.* § 5301 *et seq.*; *id.* § 6101 *et seq.*

**34.** *Compare* Edwards, *The Emerging Duty to Bargain in the Public Sector,* 71 Mich.L.Rev. 885

(1973) (arguing for greater use of private sector principles to guide development of public sector law), *with* Wellington & Winter, *The Limits of Collective Bargaining in Public Employment,* 78 Yale L.J. 1107 (1969) (stressing the inappropriateness of a full transplant of collective bargaining principles to the public sector).

**35.** *See* §§ 8(a)(5) and 8(d) of the NLRA, *codified at* 29 U.S.C. §§ 158(a)(5) and 158(d) (1976).

**36.** *Ford Motor Co. v. NLRB, supra* note 22, 441 U.S. at 498, 99 S.Ct. at 1849.

**37.** *Id.* at 500–501, 99 S.Ct. at 1851.

**38.** *Id.* at 503, 99 S.Ct. at 1852 (footnote omitted).

make recommendations simply "does not satisfy the leverage criterion of *Ford.*" Brief for petitioner at 8.

We do not believe that the *Ford Motor* decision need be read so narrowly. It is true that the Library's ability to make recommendations when exclusive decisionmaking authority is statutorily vested in the Architect is not equivalent to the contractual, economic bargaining power of Ford Motor Company. Yet it is far from obvious that the holding should be tied as closely to the facts as the Library suggests. Nowhere in the opinion does the Court indicate that anything *less* than the amount of leverage exerted by Ford would preclude a finding of negotiability. Indeed, at least some evidence supports the Authority's opposing view that the Supreme Court intended a broader application of its holding.

First, in affirming the NLRB's position in *Ford Motor,* the Court spoke in broad terms, concluding that "the Board's *consistent view* that in-plant food prices and services are mandatory bargaining subjects is not an unreasonable or unprincipled construction of the statute and that it should be accepted and enforced." [39] Implicit in the use of the term "consistent view" is approval of other Board decisions applying this construction. In one such prior decision the Board had required bargaining notwithstanding the employer's total lack of current leverage; the only option for the company was to engage a new food supplier in the future.[40] Clearly, this leverage falls short of that found in *Ford Motor* (which included the right to review prices) and thus lends support to the view that the *Ford Motor* holding need not be severely limited to its precise facts.

In addition, Justice Blackmun's separate concurrence provides a restatement of the majority's discussion which likewise sustains an extension of *Ford Motor* beyond its facts. Justice Blackmun prefers a general rule that would make food prices mandatorily bargainable only if the employer possesses "some measure of actual influence," and not simply the possibility of "future leverage." [41] While the rest of the Court did not accept this actual-versus-future distinction, Justice Blackmun's statement does at least define the majority's position in less jargonistic terms of "influence." Using his terminology, the Court's position could then be restated as: bargaining about an issue will not be futile if the employer has some influence over the decision on that issue. If viewed in that light, the Library's conceded power to consult and make recommendations to the Architect would constitute sufficient "influence" so that bargaining over the union proposals could not be considered futile under the *Ford Motor* principle.

In the final analysis, however, the relevance of *Ford Motor*'s holding for this case may well be inherently limited. While both cases deal with the problem of the futility of bargaining when the employer possesses insufficient leverage or control over the contested bargaining subject, the relationships between the employers and the third parties in the two cases are strikingly different. Ford's relationship with its food supplier is defined in strictly contractual terms—a typical illustration of arms-length, economic bargaining between two unrelated parties. The Library, however, is intimately related to the Architect. Both are federal agencies created to serve a common public good. Their relationship is determined not by money, but by statute, and that statute necessitates a working relationship between the agency that employs and directs the workers and the agency that builds the buildings in which the work is performed. In short, important considerations of public policy distinguish the case at bar from *Ford Motor,* and the Authority's decision must be supportable in light of those policies as well.

---

39. *Id.* at 497, 99 S.Ct. at 1849 (emphasis added).

40. *See Ladish Co.,* 219 NLRB 354 (1975), *enf. denied,* 538 F.2d 1267 (7th Cir.1976).

41. *Ford Motor Co. v. NLRB, supra* note 22, 441 U.S. at 505, 99 S.Ct. at 1853 (Blackmun, J., concurring).

### D. *Policy Considerations*

The Library's second main argument is that the Authority's decision is fundamentally inconsistent with Congress' declared intention that "[t]he provisions of this chapter should be interpreted in a manner consistent with the requirement of an effective and efficient Government." 5 U.S.C. § 7101(b) (Supp. V 1981). On this view, the Authority's decision will create numerous and severe practical problems for the federal government as employer. The Library, for example, contends that the length and cost of its collective bargaining negotiations could increase significantly. Disputes are also likely to arise about whether the Library has presented the negotiated recommendations to the Architect with sufficient vigor and conviction. Furthermore, bargaining with an agency that lacks power to implement agreed-upon proposals may well breed frustration and cynicism among the Library's employees. Finally, the interjection of third-party union demands could disrupt the otherwise close working relationship between the two federal agencies, the Library and the Architect.[42]

We are not persuaded by petitioner's pessimistic assessments. Congress has specifically entrusted the Authority with the responsibility to define the proper subjects for collective bargaining, drawing upon its expertise and understanding of the special needs of public sector labor relations.[43] The Authority, after considering both the limited discretion of the Library and the legitimate concerns of the Library's employees, struck a reasoned compromise by requiring the Library to bargain to the extent of its

ability to consult and make recommendations. Mindful of the practical consequences, the Authority fashioned a decision that it felt would best serve Congress' goal of promoting the collective bargaining process while simultaneously encouraging greater government efficiency.

This court finds considerable merit in the position of the Authority. The Library's employees are, after all, federal employees to whom Congress has given important bargaining rights—rights that should not be blithely ignored absent some explicit or compelling reason of governmental prerogative. Under the peculiar statute governing the Library's buildings, authority to decide crucial matters relating to the safety and character of the work environment is vested in an agency with whom the unionized Library employees have no bargaining relationship. Absent the Authority's decision, these employees would effectively be written out of the bargaining process guaranteed them by the Act; they would have absolutely no input into decisions that are at the heart of their conditions of employment. Their sole recourse for presenting their suggestions to the Architect is to convince the Library to include the unions' proposals in its recommendations.[44]

The Library contends that it is being forced to engage in "make-believe" bargaining whose obvious futility will serve only to heighten the frustration of employees without producing any tangible results. Frankly, it would seem far more likely to breed frustration, and thus disharmony in the federal sector, were the employees to be completely precluded from negotiating

---

**42.** *See* brief for petitioner at 11–14.

**43.** *See* 5 U.S.C. §§ 7105(a)(2)(E) and 7117 (Supp. V 1981). *Cf. NLRB v. Erie Resistor Corp.,* 373 U.S. 221, 236, 83 S.Ct. 1139, 1149, 10 L.Ed.2d 308 (1963) (the primary function of the NLRB in any controversy is to appraise carefully the interests of both labor and management from the perspective of "its special understanding of 'the actualities of industrial relations' ") (*quoting NLRB v. United Steelworkers of America,* 357 U.S. 357, 362–363, 78 S.Ct. 1268, 1271, 2 L.Ed.2d 1383 (1958)).

**44.** The Supreme Court has acknowledged that an important function of collective bargaining is to provide the opportunity for a union to offer information and suggestions that might be helpful to management. *See, e.g., First Nat'l Maintenance Corp. v. NLRB,* 452 U.S. 666, 681, 101 S.Ct. 2573, 2583, 69 L.Ed.2d 318 (1981). By requiring that the Library at least discuss the union proposals, the Authority's decision helps to augment the flow of information to the Library. This, in turn, may result in recommendations to the Architect that better reflect the interests of those employees for whom the building, after all, is being designed.

about their employment conditions. Furthermore, while the Library may be without statutory authority to *control* a subject of negotiation, we see no reason in law or logic to suggest why the agency and the unions should not be able to discuss and agree upon the content of the recommendations to be made to the Architect. So long as the Library has some effective voice in the Architect's decisionmaking process, bargaining about the content of its recommendations is far from an exercise in futility.[45]

Finally, we underscore the limited impact of the Authority's decision in this case. The Library is only being required to negotiate on the substance of the recommendations that it will present to the Architect. The Architect in turn is not bound to accept the recommendations. Thus the Authority's decision will serve to incorporate collective bargaining into the decisionmaking process to the fullest extent possible without transgressing the constraints imposed by statute and practical sense.

## IV. CONCLUSION

For the reasons stated herein, we find petitioners' challenges to the Authority's decision unpersuasive, and conclude that the order now on review before us should be enforced.

*So ordered.*

---

**45.** Government authorities at the state and local levels more frequently face the situation of negotiating about matters over which they do not have exclusive control. For example, a school board negotiating teacher salaries may lack the authority to approve a negotiated pay scale; it simply makes recommendations to the city council. It has been argued that such matters should still be mandatory subjects of bargaining so long as the employing body has the power to make "effective recommendations" to the agency in whom the pertinent authority resides. *See* Hanslowe & Oberer, *Determining the Scope of Negotiations Under Public Employment Relations Statutes, reprinted in* H. EDWARDS, R. CLARK & C. CRAVER, LABOR RELATIONS LAW IN THE PUBLIC SECTOR 369, 374 (2d ed.1979) (discussing New York public sector employment law).