826 F.2d 114
 126 L.R.R.M. (BNA) 2157, 264 U.S.App.D.C. 42
 NATIONAL TREASURY EMPLOYEES UNION, Petitioner,
v.
FEDERAL LABOR RELATIONS AUTHORITY, Respondent.
OVERSEAS EDUCATION ASSOCIATION (a unified State affiliate of
the National Education Association), Petitioner,
v.
FEDERAL LABOR RELATIONS AUTHORITY, Respondent.
 Nos. 85-1597, 85-1681 and 85-1635.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 23, 1986.
Decided Aug. 18, 1987.
 
 Petitions for Review of Orders of the Federal Labor Relations authority.
 Gregory O'Duden, Washington, D.C., for petitioner Nat. Treasury Employees Union ("NTEU"). Lois G. Williams and Joseph V. Kaplan, Washington, D.C., were on the brief, for petitioner NTEU.
 Richard J. Hirn, Washington, D.C., for petitioner Overseas Educ. Ass'n.
 Steven H. Svartz, Deputy Sol., Federal Labor Relations Authority ("FLRA"), with whom Ruth E. Peters, Sol., FLRA, Washington, D.C., was on the brief, for respondent. Robert J. Englehart, Atty., FLRA, Washington, D.C., was also on the brief, for respondent in Nos. 85-1597, 85-1681.
 Before BORK and BUCKLEY, Circuit Judges, and HAROLD H. GREENE,* U.S. District Judge for the District of Columbia.
 Opinion for the court filed by Circuit Judge BUCKLEY.
 BUCKLEY, Circuit Judge:
 
 
 1
 Two federal employee unions, the National Treasury Employees Union ("NTEU") and the Overseas Education Association ("OEA"), petition for review of three decisions of the Federal Labor Relations Authority ("FLRA" or "Authority"). In each case, a federal agency's managers distributed questionnaires requesting information and opinions concerning conditions of employment directly to agency employees without the approval or involvement of their union.
 
 
 2
 Petitioners allege that these independent solicitations constituted unfair labor practices under the Federal Service Labor-Management Relations Act in that they undermined petitioners' positions as exclusive collective bargaining agents for the employees they represented. The FLRA found, on the facts, that the distributions had not violated the Act because in each case the requested information was required for the effective and efficient conduct of the agencies' operations and because the solicitations did not represent an attempt by management to bypass the union's authority as the employees' exclusive bargaining agents.
 
 
 3
 In the first two cases we must decide whether the Act prohibits management from soliciting information concerning conditions of employment directly from employees without the approval or participation of their union. We find no such prohibition. We must also decide, in all three cases, whether the FLRA's determination was reasonable and consistent with the policies underlying the Act. In each instance, we find that there is ample factual evidence as well as legal authority to support the FLRA's decision.I. BACKGROUND
 
 A. Statutory Context
 
 4
 The Federal Service Labor-Management Act ("Act"), 5 U.S.C. Secs. 7101-7135 (1982), defines the rights of federal civil service employees and governs their relations with their employers.
 
 
 5
 In the preamble, Congress sets forth two principal findings:
 
 
 6
 [T]he statutory protection of the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them ... contributes to the effective conduct of public business,
 
 
 7
 and
 
 
 8
 [T]he public interest demands ... the continued development and implementation of modern and progressive work practices to facilitate and improve employee performance and the efficient accomplishment of the operations of the Government.
 
 
 9
 Section 7101(a).
 
 The preamble also declares:
 
 10
 It is the purpose of [the Act] to prescribe certain rights and obligations of the employees of the Federal Government and to establish procedures which are designed to meet the special requirements and needs of the Government. The provisions of [the Act] should be interpreted in a manner consistent with the requirement of an effective and efficient Government.
 
 
 11
 Section 7101(b).
 
 
 12
 The Act enumerates certain entitlements of labor organizations representing federal employees, including one on which petitioners principally rely:
 
 
 13
 A labor organization which has been accorded exclusive recognition is the exclusive representative of the employees in the unit it represents and is entitled to act for, and negotiate collective bargaining agreements covering, all employees in the unit.
 
 
 14
 Section 7114(a)(1).
 
 
 15
 In order to protect the right of employees and the unions representing them, the Act identifies a number of activities that, if engaged in by an agency, constitute unfair labor practices. Petitioners in each of the cases before us allege that their agencies engaged in the following activities forbidden by the Act:
 
 
 16
 (1) ... interfer[ing] with, restrain[ing], or coerc[ing] any employee in the exercise by the employee of any right under this chapter;
 
 
 17
 * * *
 
 
 18
 * * *
 
 
 19
 (5) ... refus[ing] to consult or negotiate in good faith with a labor organization as required by this chapter;
 
 
 20
 * * *
 
 
 21
 * * *
 
 
 22
 Sections 7116(a)(1) and (5).
 
 
 23
 The Act grants the FLRA authority to adjudicate unfair labor practice complaints, section 7105(a)(2)(G), as part of its general authority to "provide leadership in establishing policies and guidance relating to matters under [the Act]." Section 7105(a)(1).
 
 
 24
 B. National Treasury Employees Union Complaints
 
 
 25
 Petitioner NTEU alleges that the Internal Revenue ("IRS") and Customs Services have violated the union's statutory rights as exclusive collective bargaining representative for employees in certain of their units by (1), in the case of IRS, distributing questionnaires directly to its employees over the objection of NTEU; and (2), in the case of Customs Service, distributing questionnaires directly to its employees without prior notice to NTEU. In each instance, the questionnaires solicited employee opinions concerning aspects of their conditions of employment.
 
 1. The IRS Case
 
 26
 In the first case, the administrative law judge ("ALJ") made extensive factual findings which the Authority subsequently adopted. We cite them at some length because of their significance in determining whether management overstepped the limits of its authority.
 
 
 27
 By letter dated May 15, 1980, IRS notified NTEU that IRS was about to conduct a survey of its Appeals Organization, and further that IRS would utilize, among other procedures, interviews and questionnaires to accomplish its survey. By letter dated May 23, 1980, IRS forwarded to NTEU copies of questionnaires which were to be distributed to Senior Auditors and Appeals Auditors. One questionnaire asks, among other questions, for the employees' "general reaction" to the possible use of programmable calculators, micro computers, NCR Terminals, etc. and for an estimate of the amount of training that would be required in order to utilize the equipment. The questionnaire also asks the employee to "indicate any career ladder opportunities in which you are interested." Another attached questionnaire asks the Appeals Auditors to indicate how significant certain listed skills, knowledge and abilities are to the successful performance of the job. There were a number of questions inquiring as to the Auditors' judgments as to the value of certain past experience (e.g. prior IRS experience) in performing their job as well as how important for success were training courses.
 
 
 28
 Internal Revenue Service (District, Region, National Office Units) and National Treasury Employees Union, 19 F.L.R.A. 353, 357 (1985). Shortly after NTEU received copies of the questionnaires, it wrote IRS asking for copies of all data produced by the Appeals Organization survey. In addition, a spokesman for NTEU informed the IRS:
 
 
 29
 [W]e believe you must limit your choice of employees for desk audit to those chosen by NTEU. Consequently, please contact the local NTEU president in each office who will give you a list of people we will make available for interviews. Naturally, since the desk audits will also be formal meetings, we expect that local union representatives will be invited to attend.
 
 
 30
 Id. at 357-58. IRS replied that it would not provide the requested data "until such time as management decides to make some change. At that time you will be notified and provided with all the necessary and relevant information." Id. at 358. Shortly thereafter, IRS advised NTEU, with respect to a similar case, that the union could not participate in the employee interviews as these would be "simply an information gathering mechanism." Id.
 
 
 31
 Four months later, IRS sent NTEU copies of questionnaires it intended to distribute to another group of employees in its Appeals Organization. The new group consisted of Appeals Officers, Appeals Clerks/Appeals Aids, and Record Clerks. The questions directed to the Appeals Officers included the following:
 
 
 32
 "1. Are you satisfied with the training provided for Aids?
 
 Yes____
 No ____
 
 33
 "2. If the answer to # 1 above is "No", what additional training would you recommend?
 
 
 34
 "3. Are you satisfied with the assignment of the Aids in your office (pool concept, 1 Aid to 2/3 Appeals Officers, etc.?)
 
 Yes____
 No ____
 
 35
 "4. If the answer to # 3 above is "No", what changes would you recommend?
 
 
 36
 * * *
 
 
 37
 "11. Do you have any suggestions that you believe would improve the efficiency of clerical operations?
 
 
 38
 "Do you have suggestions for improvement of your job as an Appeals Clerk or as an Appeals Aid?
 
 Yes____
 No ____
 
 39
 "If 'Yes,' please explain:"
 
 
 40
 Id. at 358-59. The Record Clerks and Appeals Clerks/Appeals Aids were asked "if their training had been adequate and if they had any suggestions for improving their jobs." Id. at 359. NTEU responded immediately, urging IRS
 
 
 41
 not to implement [the survey] because of the improper nature of several questions. Those questions which seek the opinion of unit employees about working conditions or changes therein they would like to see are violations of our rights under 5 U.S.C. Sec. 7100 et seq.
 
 
 42
 In addition, [we] invoke our right to negotiate over any negotiable issues. Please prepare a briefing after which I will forward proposals.
 
 
 43
 Id. (quoting letter from NTEU to IRS).
 
 
 44
 IRS subsequently rejected NTEU's request because the survey "is simply an information gathering mechanism." Id. The final finding pertinent to this appeal is that:
 
 
 45
 Commencing in September or October 1980, the questionnaires which were sent to NTEU on October 6, 1980, were distributed nation wide [sic] to Appeals Officers, Appeals Clerk [sic]/Appeals Aids and Record Clerks in the IRS' districts. IRS distributed these questionnaires to the bargaining unit employees without negotiating with NTEU.
 
 
 46
 Id.
 
 
 47
 The ALJ held that by "distributing questionnaires to unit employees regarding their conditions of employment," the IRS had committed an unfair labor practice because it had bypassed the union. Id. at 353-54. On appeal, the FLRA dismissed the NTEU complaint, agreeing with the IRS that "the use of such questionnaires was a proper information gathering mechanism being utilized as part of a comprehensive study of its Appeals Organization. Id. at 354. The FLRA further held that "there is no indication that through the questionnaires the [IRS] attempted to deal or negotiate directly with unit employees concerning their conditions of employment or in any manner created the appearance of doing so." Id. at 355.
 
 2. The Customs Service Case
 
 48
 The appeal in the Customs Service case also concerns the direct distribution of questionnaires by an agency to its employees, except that in this case NTEU was not advised of the agency's intentions. The Customs Service questionnaires were mailed to a random sampling of employees as part of an internal audit of an Employee Performance Appraisal System ("EPAS") that had been introduced eight months earlier as a result of an agreement negotiated by NTEU. The ALJ characterized the questions asked employees as follows:
 
 
 49
 Questions 1 through 5 were designed to elicit data concerning the date employees surveyed were first introduced to EPAS, the source of introductory information about the program, the quality of the introduction, and whether employees surveyed had previously read prepared printed material about EPAS. Question 6 was designed to obtain an evaluative comparison between EPAS and the employee rating system which had preceded EPAS. Questions 7 and 8 constituted inquiries concerning the nature of views held about EPAS by supervisors; and Questions 9 through 12 were designed to obtain a detailed evaluation of EPAS as implemented by management. Question 13 was structured to obtain employee views concerning the most desirable method of developing employee performance plans. Questions 14 through 19 sought employee evaluations of the presentation of progress reviews by supervisors. Questions 20 and 21 concerned the issue of whether EPAS provided an adequate vehicle for discussing work performance with supervisors. Questions 22 through 24 pertained to employee evaluation of the progress review phase of EPAS; and Question 25 was designed to obtain employee perceptions of administrative action which might flow from poor performance under EPAS.
 
 
 50
 United States Customs Service and National Treasury Employees Union, 19 F.L.R.A. 1032, 1039 (1985) (footnote omitted).
 
 
 51
 The ALJ found that this solicitation of employee views was "an attempt by management to negotiate directly with bargaining unit employees," id. at 1048, and "was in derogation of the Union's rights as the exclusive representative. Accordingly, it is concluded that the conduct violated Sections 7116(a)(1) and (5)." Id. at 1049. The FLRA disagreed, concluding that the Customs Service had not violated subsections 7116(a)(1) and (5) becausethe questionnaires were an information gathering mechanism in connection with the management function of studying its operations, and because there was no indication that management attempted to deal or negotiate directly with unit employees concerning their conditions of employment.
 
 
 52
 Id. at 1034.
 
 3. Assertion of Per Se Rule
 
 53
 In appealing the FLRA's dismissal of both complaints, NTEU asserts a per se rule against any direct communication between management and union-represented employees in which management solicits information concerning conditions of employment without the approval or cooperation of the union. NTEU suggests that "[i]t is the very soliciting of employees' views on working conditions per se which is tantamount to bargaining directly with employees." Brief for Petitioner NTEU (No. 85-1597) at 27-28; see id. at 28-29 ("[T]he undisputed facts are that the IRS did solicit employee opinions and suggestions concerning working conditions.... This conduct, without more, is sufficient to establish that the IRS bypassed NTEU, the exclusive representative...."); see also Briefs for Petitioner NTEU (Nos. 85-1597 & 85-1681) at 11 ("when the employer solicits opinions on working conditions, it crosses the line of permissible conduct").
 
 C. Overseas Education Association Complaint
 
 54
 Petitioner OEA represents the teachers, counselors, and other school-level professional employees of the Department of Defense, Office of Dependents Schools ("DoDDS"). OEA alleges that DoDDS' management violated OEA's statutory right to exclusive collective bargaining representation when it distributed a questionnaire to teachers who had been recently hired for overseas assignments. The questionnaire solicited suggestions for improvements in personnel recruitment and processing practices.
 
 
 55
 As with the NTEU appeal, the FLRA again adopted extensive factual findings by the ALJ, from which we quote:
 
 
 56
 On October 20, 1982, Respondent [DoDDS], in order to improve its procedures with respect to processing newly hired teachers assigned to overseas schools mailed a questionnaire to all newly appointed CONUS (Continental United States) educators. The covering memorandum and the questionnaire read as follows:
 
 MEMORANDUM FOR Newly Appointed CONUS Educators
 SUBJECT: New Employee Questionnaire
 
 57
 A few months ago you joined the Department of Defense Dependents Schools (DoDDS) professional staff. By this time you have undoubtedly formed some definite ideas and impressions about your processing and work assignment. This questionnaire is designed as a tool to evaluate the DoDDS recruitment and appointment process. Such evaluation is undertaken in order to make our procedures more efficient and informative for the applicant. Now that you have become a DoDDS employee, we ask your assistance in making the "path" easier for others to follow.
 
 
 58
 We hope that you will take the time to answer these questions carefully and that you will not hesitate to give us the benefit of any suggestions for improvements.
 
 
 59
 Please record your responses on the answer sheet provided.... We will not discuss individual responses with any regional director, personnel official, or finance official.
 
 
 60
 Your prompt attention and cooperation will be greatly appreciated.
 
 NEW EMPLOYEE QUESTIONNAIRE
 
 61
 PLEASE RECORD YOUR RESPONSES ON THE ATTACHED ANSWER SHEET
 
 
 62
 1. Did the questions asked during your interview allow you to be adequately assessed as an educator and as to your potential to succeed in an overseas assignment?
 
 A. Yes
 
 63
 B. No2. In which of the following areas did you need additional information?
 
 
 64
 A. Area information, teaching assignment, housing, and living conditions
 
 B. Sponsor
 
 65
 C. Appointments, allowances, and transportation entitlements
 
 D. Employee benefits
 
 66
 E. Other. Please specify.
 
 
 67
 * * *
 
 
 68
 * * *
 
 
 69
 18. Was your first pay check received in a reasonably timely manner?
 
 A. Yes
 B. No
 
 70
 Department of Defense Office of Dependents Schools and Overseas Education Association, 19 F.L.R.A. 762, 766-70 (1985) (questions 3-17 omitted). On reviewing the record, the ALJ found that "the questionnaire was distributed to the newly hired CONUS employees without any prior notice to, or bargaining with, the Union." Id. at 770.
 
 
 71
 The questionnaire addressed some subjects that were scheduled to be covered in pending negotiations of a "master agreement."
 
 
 72
 According to Mr. Jack Rollins, President of the Union, various items encompassed in the questionnaire, namely, employee performance requirements, educator career program, equal employment opportunity and advanced pay, are currently the subject of negotiations for a master agreement. [Footnote: "The negotiations for a master agreement commenced on December 15, 1982."]
 
 
 73
 Id. The DoDDS Chief of Staffing claimed that the questionnaire was intended "simply to evaluate the CONUS processing and actually the entire recruitment appointment process." Id. She also acknowledged that DoDDS "distributed the 1982 questionnaire without prior notice to, or bargaining with, the Union." Id.
 
 
 74
 The ALJ stated that the distribution of the DoDDS questionnaire did not, by itself, violate OEA's statutory rights, even in the face of pending negotiations that would address the same subject matter, id. at 774; but because the memorandum accompanying the questionnaire solicited the employees' "suggestions for improvement," the ALJ concluded that DoDDS' conduct "amounted to a bypass of the Union, derogated the Union's status as the certified representative of the unit employees, and, consequently, violated Sections 7116(a)(1) and (5) of the Statute." Id. On appeal, the Authority dismissed the complaint, finding that the agency's actions had not violated the statute. Id. at 764.
 
 II. ANALYSIS
 A. Standard of Review
 
 75
 In Bureau of Alcohol, Tobacco and Firearms v. FLRA ("BATF"), 464 U.S. 89, 104 S.Ct. 439, 78 L.Ed.2d 195 (1983), the Supreme Court provided specific guidance for court review of FLRA decisions:
 
 
 76
 [T]he FLRA was intended to develop specialized expertise in its field of labor relations and to use that expertise to give content to the principles and goals set forth in the [Civil Service Reform Act of 1978]. ... Consequently, the Authority is entitled to considerable deference when it exercises its "special function of applying the general provisions of the Act to the complexities" of federal labor relations....
 
 
 77
 On the other hand, the "deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress." ... Accordingly, while reviewing courts should uphold reasonable and defensible constructions of an agency's enabling Act, ... they must not "rubber-stamp ... administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute."
 
 
 78
 464 U.S. at 97-98, 104 S.Ct. at 444 (citations omitted). In a footnote to the same opinion, the Supreme Court clarified both the role of the FLRA in policy-making and the appropriate weight owed to FLRA policy decisions:
 
 
 79
 Congress did, however, afford the FLRA broad authority to establish policies consistent with the act, see Secs. 7105 and 7134.... [W]e find it unnecessary to rest our decision on a precise classification of the FLRA's action. As we explain in the text, an agency acting within its authority to make policy choices consistent with the congressional mandate should receive considerable deference from courts, provided, of course, that its actions conform to applicable procedural requirements and are not "arbitrary, capricious, an abuse of discretion, or not otherwise [sic] in accordance with law," 5 U.S.C. Sec. 706(2)(A).... When an agency's decision is premised on its understanding of a specific congressional intent, however, it engages in the quintessential judicial function of deciding what a statute means. In that case, the agency's interpretation, particularly to the extent it rests on factual premises within its expertise, may be influential, but it cannot bind a court.
 
 
 80
 464 U.S. at 98 n. 8, 104 S.Ct. at 444-45 n. 8 (citations omitted).
 
 
 81
 The present dispute involves the Authority's interpretation and application of the provisions of its enabling statute. In Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., the Supreme Court elaborated on the deference owed an agency's interpretation of a statute entrusted to its administration:
 
 
 82
 [I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.
 
 
 83
 "The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." ... [When the legislative delegation is implicit], a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.
 
 
 84
 467 U.S. 837, 843-44, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (citations omitted), rehearing denied, 468 U.S. 1227, 105 S.Ct. 28, 82 L.Ed.2d 921 (1984). While Chevron dealt with the authority of an agency to fill in gaps in the statutory scheme mandated by Congress, the reasoning of that case is applicable to the one at hand. Here, the FLRA is required to reconcile the tensions that will at times exist between the twin objectives set forth in the Act; namely, protection of the right of federal employees to the exclusive representation of a union of their choice, and advancement of the government's ability to operate in an effective and efficient manner.
 
 
 85
 Thus in the cases before us, we are bound to defer to the agency's decisions balancing those objectives unless, in the context of the particular adjudication, the agency's decision is not reasonable, Chevron, 467 U.S. at 844, 104 S.Ct. at 2782-83, or "neither rests on specific congressional intent nor is consistent with the policies underlying the Act." BATF, 464 U.S. at 98 n. 8, 104 S.Ct. at 444-45 n. 8; see Beth Rochel Seminary v. Bennett, 825 F.2d 478, 480 (D.C.Cir. 1987) (adhering to Chevron rule). But see Union of Concerned Scientists v. U.S. Nuclear Regulatory Commission, 824 F.2d 108, 113-114 (D.C.Cir.1987) (dictum ).
 
 B. Petitioners' Legal Case
 
 86
 Petitioner NTEU relies principally on Emporium Capwell Co. v. Western Addition Community Org., 420 U.S. 50, 95 S.Ct. 977, 43 L.Ed.2d 12 (1975), and Obie Pacific, Inc., 196 N.L.R.B. 458 (1972), for the proposition that a federal agency's management "illegally bypassed [the] exclusive representative of its employees when it directly solicited bargaining unit employees' opinions concerning bargainable conditions of employment." Briefs for Petitioner NTEU (Nos. 85-1597 & 85-1681) at 9; see also id. at 7 ("Determining employee sentiment on working conditions is the sole province of the union. Obie Pacific, Inc., 196 N.L.R.B. 458 (1972)."). Petitioner OEA relies principally on Obie Pacific plus three other National Labor Relations Board cases, Bob's Big Boy Family Restaurants, 264 N.L.R.B. 432 (1982), M.A. Harrison Mfg. Co., 253 N.L.R.B. 675 (1980), and St. Joseph's Hospital, 247 N.L.R.B. 869 (1980), essentially in support of the same proposition. See Brief for OEA at 14-15 ("There is an established line of cases, ignored by the FLRA, which hold that it is an unfair labor practice for an employer to survey employees about their attitudes towards, and changes they wish to make to working conditions while negotiations over the same subjects are pending with the employees' union."). Each of these principally relied upon cases, however, involve interpretations of the National Labor Relations Act, which controls labor-management relations in the private sector, whereas the cases before us all deal with the unique provision of the law governing management-labor relations in the public sector.
 
 
 87
 In Library of Congress v. FLRA, 699 F.2d 1280 (D.C.Cir.1983), which issued before the Supreme Court's BATF opinion, this court urged caution in the application of private sector labor law precedent to public sector labor cases, particularly in the area of collective bargaining:
 
 
 88
 The scope of collective bargaining is far broader in the private sector, and the bargaining status of any given subject is determined by different statutory provisions and by different policy considerations. While these differences do not lead us to eschew completely the private sector model in defining the limits of negotiability in the public sector, we shall be careful to appreciate fully those distinctions between the private and public sectors that might necessitate a different legal analysis and conclusion.
 
 
 89
 699 F.2d at 1287 (citations omitted). While the FLRA may have been modeled after the NLRB, see National Treasury Employees Union v. FLRA, 810 F.2d 295, 299 (D.C.Cir.1987), we are nevertheless called upon here to apply a statutory policy that is unique to the public sector; and while private sector law may provide useful guidance in certain instances, see, e.g., id. at 299-300; Library of Congress, 699 F.2d at 1287, the Act itself must ultimately be interpreted in the context of its own language, history, and case law.
 
 
 90
 The rights of unions in the federal sector are statutory rights, enumerated by Congress in the Federal Service Labor-Management Relations Act. The Act expressly affirms the duty of government agencies to operate in an effective and efficient manner, and requires that its provisions be construed in a manner consistent with that obligation. Nothing comparable to this is to be found in private labor law. It is beyond the power of this court to write into the Act union rights that Congress has failed to grant.
 
 C. No Per Se Rule
 
 91
 We hold that the Act does not impose a per se rule against any direct solicitation by management of information concerning conditions of employment from employees represented by a duly recognized labor union. Neither the Act nor any prior cases interpreting the Act implies such a rule.
 
 
 92
 The Act expressly provides federal civil service employees the right "to engage in collective bargaining with respect to conditions of employment through representatives chosen by employees under this chapter." 5 U.S.C. Sec. 7102(2) (1982). The Act further defines "collective bargaining" as
 
 
 93
 the performance of the mutual obligation of the representative of an agency and the exclusive representative of employees in an appropriate unit in the agency to meet at reasonable times and to consult and bargain in a good-faith effort to reach agreement with respect to the conditions of employment affecting such employees and to execute, if requested by either party, a written document incorporating any collective bargaining agreement reached, but the obligation referred to in this paragraph does not compel either party to agree to a proposal or to make a concession[.]
 
 
 94
 Section 7103(a)(12). We believe this language provides ample guidance for determining the scope of the word "negotiate" as used in the section of the Act that both unions allege their agencies have violated: "[I]t shall be an unfair labor practice for an agency ... to refuse to consult or negotiate in good faith with a labor organization as required by this chapter[.]" Section 7116(a)(5). At least in this context, the terms "negotiate" and "bargain" seem to be used interchangeably.
 
 
 95
 Nowhere does the Act imply that a union's exclusive representation of employees at the bargaining table precludes direct communication between management and its employees for other purposes. Nevertheless, NTEU claims that there are no circumstances under which management may solicit information relating to working conditions directly from those in the best position to provide it, namely, employees. Such a claim is unsupported by the statutory language.
 
 
 96
 The rights of unions under the Act must be interpreted in the context of the Act's parallel concerns for (1) the right of federal employees to exclusive representation by a union of their choice and (2) the advancement of governmental effectiveness and efficiency. That the second concern is not to be subordinated to the first is made absolutely clear by the command that the Act's provisions "be interpreted in a manner consistent with the requirement of an effective and efficient Government." Section 7101(b). Thus management has the dual obligation to bargain with its employees' exclusive representative in good faith and to advance the public's interest in efficient government.
 
 
 97
 It should be self-evident that achievement of the latter goal will at all times require reliable information and views only employees are in a position to give; and it stands to reason that the reliability of such information will not be enhanced by filtering through a third party such as a union. Thus there can be no basis for a per se rule of the kind NTEU would have us adopt. At the same time, a search for reliable information may not be used as a screen behind which to subvert a union's role as its members' exclusive collective bargaining representative. Therefore, the facts of these cases are to be examined in the light of the following guidance which is provided by the FLRA, and which we endorse:
 
 
 98
 [A]n agency may question employees directly provided that it does not do so in a way which amounts to attempting to negotiate directly with its employees concerning matters which are properly bargainable with its employees' exclusive representative. In this regard ... management must have the latitude to gather information, including opinions, from unit employees to ensure the efficiency and effectiveness of its operations.
 
 
 99
 19 F.L.R.A. at 354. We now apply this guiding principle to the facts of the three cases before us.
 
 D. Case-By-Case Analysis
 
 100
 Collective bargaining requires that during the course of negotiation each bargaining party be represented by a single voice. Thus a key issue, decided by the Authority in favor of the agency in each case, is whether the allegedly unfair labor practices occurred during the course of negotiation, i.e., during bargaining.
 
 
 101
 The IRS Complaint. In looking closely at the factual setting of the IRS' alleged violation of sections 7116(a)(1) and (5), we think it significant that the IRS notified the union in advance of its intent to distribute the questionnaires, provided it with copies, and advised NTEU that should the IRS "determine that changes are necessary as a result of this study and such changes affect bargaining unit employees, you will be properly notified." Furthermore, if negotiations were to proceed, management undertook to provide the union "with any information from the study ... which is necessary for negotiation." As evidenced by this notification and assurance, the agency clearly recognized its statutory obligation to negotiate with the union should the agency contemplate any changes in work conditions. Because of these indicia of good faith, and because we find no indications in the record that suggest the IRS trespassed on NTEU's statutory prerogatives, we find no basis for concluding that the IRS had committed an unfair labor practice as defined by the Act.
 
 
 102
 The Customs Service Complaint. Unlike the IRS, the Customs Service did not notify the union beforehand of its intent to distribute a questionnaire to employees. While the questionnaire was addressed to a recently negotiated and implemented employee performance appraisal system, we find nothing in the questions asked to suggest an attempt to negotiate directly with the employees over the newly adopted system or over any other matter concerning conditions of employment. To the contrary, the questions are completely consistent with a bona fide attempt by management to determine how the new appraisal system is working. The FLRA reasonably concluded that the direct solicitation of information in this case was an appropriate exercise of the agency's responsibility to see that its affairs are conducted in an effective and efficient manner.
 
 
 103
 DoDDS Complaint. We find this a more difficult case than the prior two solely because negotiations scheduled to begin in the near future would be dealing, in part, with matters that were the subject of the questionnaire circulated by DoDDS to its employees. We note at the outset that the ALJ found no problem with the questionnaire itself. Rather, he based his finding that DoDDS had committed unfair labor practices entirely on the language in the covering memorandum in which the agency expressed its hope that employees "will not hesitate to give us the benefit of any suggestions for improvements." 19 F.L.R.A. at 767; see id. at 775 ("the Respondent's conduct in soliciting suggestions for improvement of the recruitment and appointment process, without first obtaining the Union's consent, constituted a bypass of the Union in violation of Sections 7116(a)(1) and (5) of the Statute.").
 
 
 104
 On reviewing the record, we find no indication that the solicitation of "suggestions for improvement" was intended to be, or in fact constituted, an attempt "to negotiate directly with [DoDDS] employees concerning matters which are properly bargainable with its employees' exclusive representative." The fact that the agency assured employees that information received from the survey would not be discussed with any "regional director, personnel official, or finance official" suggests the absence of any hidden purpose. Furthermore, there is no evidence in the record to suggest that DoDDS actually negotiated directly with any unit employees concerning their conditions of employment. The "solicitation" in the covering memorandum could reasonably be interpreted as an assurance that the questionnaire was designed as a management tool to evaluate the agency's recruitment and appointment process. Accordingly, we find no basis for questioning the FLRA's conclusion that the circulation of the memorandum and questionnaire did not violate the Act.
 
 III. CONCLUSION
 
 105
 On review of the records, briefs, and oral arguments of the parties, considering the standard of review, we hold that each of the FLRA's conclusions was reasonable, and that each "rests on specific congressional intent [and] is consistent with the policies underlying the Act."
 
 Accordingly, the three decisions are
 
 106
 Affirmed.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. Sec. 292(a)