**UNION OF CONCERNED SCIENTISTS,
et al., Petitioners**

**v.**

**U.S. NUCLEAR REGULATORY COM-
MISSION and the United States of
America, Respondents**

**Nuclear Utility Backfitting and Reform
Group, Intervenor (Two Cases).**

Nos. 85–1757, 86–1219.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 6, 1987.

Decided Aug. 4, 1987.

Ellyn R. Weiss, with whom Diane Curran and Andrea C. Ferster, Washington, D.C., were on the brief, for petitioners.

Martin G. Malsch, Associate General Counsel for Licensing and Regulation, Nuclear Regulatory Commission, with whom William C. Parler, General Counsel, William H. Briggs, Jr., Sol., E. Leo Slaggie, Deputy Sol., Steven F. Crockett, Atty., Nuclear Regulatory Com'n, Peter R. Steenland, Jr., Chief, Appellate Section, and Jacques B. Gelin, Atty., Dept. of Justice, Washington, D.C., were on the brief, for respondent. Robert L. Klarquist, Sarah P. Robinson, and David C. Shelton, Attys., Dept. of Justice, Washington, D.C., ·also entered appearances for respondent.

Nicholas S. Reynolds, with whom Joseph B. Knotts, Jr. and Sanford L. Hartman, Washington, D.C., were on the brief, for intervenor.

Barton Z. Cowan, Pittsburgh, Pa., was on the brief, for amicus curiae Atomic Indus. Forum, Inc., urging the denial of the petition for review.

Before MIKVA, EDWARDS and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

Concurring opinion filed by Circuit Judge WILLIAMS.

MIKVA, Circuit Judge:

This case involves recurring questions: whether and to what extent a regulatory agency may consider factors such as economic costs in carrying out "health-based" statutory provisions. Specifically, the instant petition requires us to determine the extent of the Nuclear Regulatory Commission's (NRC or Commission) authority to consider economic costs when deciding whether to order safety-enhancing modifications to previously licensed nuclear power plants. Appellant Union of Concerned Scientists (UCS) challenges a final rule promulgated by the NRC concerning the "backfitting" of nuclear reactors. The term "backfitting" refers generally to NRC actions that require modification of the design, equipment, or operating procedures of nuclear power reactors previously licensed for construction or operation. The UCS attacks the rule primarily on the ground that it violates the Atomic Energy Act (the Act), 42 U.S.C. § 2011 *et seq.*, by requiring the NRC to take economic costs into account in deciding whether to impose a backfit. The UCS asserts that the Act forbids the NRC from ever considering economic costs in the backfitting process. We disagree with the UCS's broad construction of the Act; we believe that the NRC may take costs into account in making certain backfit decisions. We conclude, however, that the rule at issue violates the Act by allowing the consideration of costs in circumstances in which the Act precludes it. We therefore vacate the NRC's backfitting rule.

## I. BACKGROUND

### A. *Relevant Statutory Provisions*

Section 182(a) of the Act provides the primary statutory standard relating to the Commission's mandate to ensure the safe operation of nuclear power plants. That section requires the Commission to ensure that "the utilization or production of special nuclear material will ... provide adequate protection to the health and safety of the public." 42 U.S.C. § 2232(a). In its rules and decisions, the Commission refers to this standard as either the "adequate protection" standard or the "undue risk" standard. *See, e.g., Long Island Lighting Co.,* 18 N.R.C. 445, 464–65 (1983). Whatever the genesis of the latter term, the Commission uses it interchangeably with section 182(a)'s actual language.

Section 161 of the Act "authorize[s]" the Commission to take a variety of measures "[i]n the performance of its functions." 42 U.S.C. § 2201. Two subsections of this section empower the NRC to take steps

relating to the protection of the public health and safety. Subsection (b) authorizes the Commission to "establish by rule, regulation, or order, such standards and instructions to govern the possession and use of special nuclear material, source material, and byproduct material as the Commission may deem necessary or desirable ... to protect health or to minimize danger to life or property." 42 U.S.C. § 2201(b). Subsection (i) empowers the NRC to "prescribe such regulations or orders as it may deem necessary ... to govern any activity authorized pursuant to this chapter, including standards and restrictions governing the design, location, and operation of facilities used in the conduct of such activity, in order to protect health and to minimize danger to life or property." 42 U.S.C. § 2201(i).

### B. *Regulatory History*

The NRC promulgated its first rule concerning the "backfitting" or safety-enhancement of nuclear reactors in 1970. In explaining the need for such a rule, the NRC noted that "rapid changes in technology in the field of atomic energy result in the continual development of new or improved features designed to improve the safety of production and utilization facilities." 35 Fed.Reg. 5,317 (March 31, 1970). The rule addressed these technological changes by setting forth a standard governing when the NRC could require a plant previously licensed for construction or operation to incorporate a new safety feature. The rule stated that "[t]he Commission may ... require the backfitting of a facility if it finds that such action will provide substantial, additional protection which is required for the public health and safety or the common defense and security." 10 C.F.R. § 50.109(a) (1971). The rule excepted from this standard any backfit that was necessary to bring a facility into compliance with its license or a Commission order, rule, or regulation. *See id.* at § 50.-109(b). A backfit of this kind was apparently always required.

By the end of the 1970s, the backfit rule had become the target of widespread criticism. Several governmental bodies charged that the rule allowed the Commission to ignore the need for backfitting outmoded plants. *See, e.g.,* Report of the President's Commission on the Accident at Three Mile Island, The Need for Change; The Legacy of TMI at 20 (October 1979) (stating that the rule had not forced the NRC to "systematically consider[ ]" the "need for improvement of older plants"). Other governmental groups charged that the rule allowed the Commission to impose backfits indiscriminately, without regard to their real necessity or cost. *See, e.g.,* J. Tourtellotte, Chairman, Regulatory Reform Task Force, U.S. Nuclear Regulatory Commission, Report on Backfitting and Licensing Practices at the U.S. Nuclear Regulatory Commission 3 (March 11, 1985) ("[T]he staff's prior backfitting practices which have cost consumers billions of dollars have made nuclear plants more difficult to operate and maintain, have injected uncertainty and paralyzing delay into the administrative process and in some instances may have reduced rather than enhanced public health and safety."); Surveys and Investigations Staff, House Committee on Appropriations, Report to the Committee on Appropriations, U.S. House of Representatives on the Nuclear Regulatory Commission 54 (March 1985). All commentators appeared to agree that the rule had failed to systematize or rationalize the Commission's backfitting process.

In response to the waxing criticism of the 1970 rule, the NRC published an advance notice of proposed rule-making on September 28, 1983. *See* 48 Fed.Reg. 44,-217. The advance notice invited public comment on draft backfit rules proposed by the Commission's Regulatory Reform Task Force and the Atomic Industrial Forum, the trade association of the nuclear power industry. Fourteen months later, after having received and reviewed numerous comments, the Commission published a proposed version of the final rule. *See* 49 Fed.Reg. 47,034 (November 30, 1984). Interested parties commented on the rule, focusing especially on the authority of the Commission to consider economic costs when deciding whether to impose backfits.

On September 20, 1985, the Commission published its final rule, which became effective on October 21, 1985. *See* 50 Fed. Reg. 38,097.

The heart of the final backfit rule *lies* in the standard governing the circumstances in which the Commission will order a backfit under the authority of the rule. The standard incorporates the 1970 rule's requirement that the backfit substantially increase protection to health and safety, but adds an additional requirement that the benefits of the backfit justify its costs. Specifically, the rule provides:

> The Commission shall require the backfitting of a facility only when it determines ... that there is a substantial increase in the overall protection of the public health and safety or the common defense and security to be derived from the backfit and that the direct and indirect costs of implementation for that facility are justified in view of this increased protection.

10 C.F.R. § 50.109(a)(3) (1986).

The rule sets forth in some detail the way in which the NRC is to make the determination of whether a proposed backfit meets the governing standard. The rule requires that the NRC prepare a "systematic and documented analysis" of each proposed backfit. *Id.* at § 50.109(a)(2). In conducing this analysis, the NRC is to consider available information concerning nine factors:

(1) the specific objectives of the proposed backfit;

(2) the activity that would be required by the licensee to complete the backfit;

(3) the potential change in risk to the public resulting from the backfit;

(4) the potential impact of the backfit on the radiological exposure of the facility's employees;

(5) the costs of installation and maintenance associated with the backfit, including the cost of facility downtime or construction delay;

(6) the potential impact on safety of the changes in plant or operational complexity resulting from the backfit;

(7) the estimated resource burden on the NRC associated with imposing the backfit;

(8) whether the relevancy and practicality of the particular kind of backfit will vary from facility to facility; and

(9) whether the backfit is an interim measure and, if so, the justification for imposing the backfit on an interim basis.

In addition to considering these nine factors, the Commission is to take into account "any other information relevant and material to the proposed backfit" in preparing the requisite analysis. *Id.* at § 50.-109(c).

The rule then states that "backfit analysis is not required and the standard does not apply" in three situations. *Id.* at § 50.109(a)(4). The first exception, similar to the exception in the 1970 rule, is when a backfit is necessary to bring a facility into compliance with a license, the rules or orders of the Commission or written commitments of the licensee. *Id.* at § 50.-109(a)(4)(i). The second exception is when "an immediately effective regulatory action is necessary to ensure that the facility poses no undue risk to the public health and safety." *Id.* at § 50.109(a)(4)(ii). The rule provides that the imposition of a backfit falling within this exception "shall not relieve the Commission of performing an analysis after the fact to document the safety significance and appropriateness of the action taken." *Id.* at § 50.109(a)(2). The third exception appears in a footnote appended to the subsection containing the second exception. This footnote, whose meaning is critically important to this case, states:

> For those modifications which are to ensure that the facility poses no undue risk to the public health and safety and which are not deemed to require immediately effective regulatory action, analyses, are required; these analyses, however, should not involve cost considerations except only insofar as cost contributes to selecting the solution among various acceptable alternatives to ensuring no undue risk to public health and safety.

*Id.* at § 50.109(a)(4)(ii) n. 3. Taken together, these three provisions essentially state that the benefits of a backfit need not justify its costs when the backfit is necessary to bring a facility into compliance with rules or licenses or to ensure adequate protection of the public health and safety.

In explaining the rationale supporting these three exceptions, the Statement of Considerations accompanying the final rule states that "[t]he consideration and weighing of costs contemplated by the rule applies to backfits that are intended to result in incremental safety improvements for a plant that already provides an acceptable level of protection." 50 Fed.Reg. 38,103 (September 20, 1985). The Statement of Considerations also asserts that "[t]he costs associated with the proposed new safety requirements may be considered by the Commission provided that the Atomic Energy Act finding 'no undue risk' can be made." *Id.* at 38,101. These statements might be read to suggest that the exceptions are meant to ensure that the Commission will impose backfits regardless of costs when the backfits are necessary to provide adequate protection to the health and safety of the public. Other assertions in the Statement of Considerations, however, place a significant gloss on this explanation. Most notably, the Statement of Considerations provides that "there is no intent on the part of the Commission to include within the scope of the[se] exception[s] new or modified interpretations of what constitutes no undue risk to the public health and safety. In such a case, the rule applies." *Id.* at 38,103. The Statement repeats this admonition in almost identical terms on the same page. *See id.* These statements indicate that the drafters of the rule intended the cost-justification standard to apply when the Commission establishes the scope and range of safety measures that the adequate-protection standard requires imposing on previously licensed power plants. The exceptions provide only that the rule's cost-justification standard will not apply when the Commission determines whether actually to enforce these previously established safety requirements by ordering a backfit.

The rule itself makes no mention of the ability of licensees or members of the public to participate in the making of backfitting decisions. The Statement of Considerations, however, asserts that "the Commission has directed the EDO [Executive Director for Operations of the NRC] to establish backfit procedures and to ensure appropriate rights of appeal." *Id.* at 38,101. In accordance with this directive, the EDO established such procedures in February of 1986. These procedures now appear in Chapter 0514 of the NRC Manual, which is a multi-volume document consisting of managerial directives to NRC personnel relating to various aspects of the Commission's internal operations. Chapter 0514 sets forth the series of steps that members of the NRC staff will take in deciding whether to order a backfit pursuant to the rule and provides licensees with an opportunity to appeal staff determinations at each stage of the decision-making process. The first step the staff must take is to decide whether the proposed modification falls within one of the exceptions listed in the rule. If the staff decides that the proposed backfit does fall within one of these exceptions and thus that the cost-justification standard does not apply, the licensee may appeal this decision. Assuming that the staff determines that the proposed backfit does *not* fall within one of the exceptions, the staff is to prepare the analysis described in the final rule. If the staff concludes from this analysis that a backfit is appropriate, the licensee may appeal this determination. The chapter makes no provision for public comment at any stage of the decisionmaking process.

## C. *The Instant Case*

In November of 1985, after the publication of the final rule but prior to the adoption of Chapter 0514, appellant UCS filed a petition for review of the final rule. The petition raised three claims. First and foremost, the UCS challenged the rule on the ground that the Commission has no authority under the Atomic Energy Act to consider costs in making any decisions regarding backfits. Second, the UCS

charged that even assuming the Act allows the NRC to weigh costs against benefits in deciding whether to impose a backfit, the rule is arbitrary and capricious because it excludes from the prescribed analysis any consideration of the economic savings that would result from a backfit that prevents an accident. Third, the UCS alleged that the rule is arbitrary and capricious because it encourages undue reliance on a technique called probabilistic risk assessment to weigh the costs and benefits of proposed backfits. In April of 1986, the UCS filed a separate petition for review challenging Chapter 0514 of the NRC Manual. In this petition, the UCS charged that the procedures contained in the Chapter violate both the Atomic Energy Act and the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.* (1977), by failing to offer interested members of the public an opportunity to comment on backfitting decisions. By order dated June 20, 1986, this court consolidated the two petitions. The Nuclear Utility Backfitting and Reform Group, an association of power companies, intervened in the consolidated cases on the Commission's behalf. In addition, the Atomic Industrial Forum submitted a brief as *amicus curiae* defending both the final rule and the procedures contained in Chapter 0514 of the NRC Manual.

## II. DISCUSSION

A. *Standard of Review*

The Administrative Procedure Act provides that a reviewing court shall hold unlawful agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a). The primary question in this case is whether the NRC's backfitting rule is in accordance with the health and safety provisions of the Atomic Energy Act. To decide this question, we must first determine what deference, if any, is due to the Commission's own interpretation of the Act, which is the NRC's organic statute.

For several years, *Chevron, U.S.A. Inc. v. National Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1983), controlled this determination in all situations. *Chevron* provided an all-purpose two-pronged test for deciding whether to give deference to an agency's interpretation of its organic statute:

> First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 842–43, 104 S.Ct. at 2781–82 (footnotes omitted). In the recent case of *Immigration and Naturalization Service v. Cardoza-Fonseca,* —— U.S. ——, 107 S.Ct. 1207, 1220–22, 94 L.Ed.2d 434 (1987), however, the Supreme Court strongly indicated that courts are to apply the *Chevron* test only in circumstances in which an agency is required to apply a legal standard to a particular set of facts. When the court faces "a pure question of statutory construction," the court need not defer to agency opinion, even if the statutory provision at issue admits of some ambiguity. *Id.; see International Union, UAW v. Brock,* 816 F.2d 761, 764, 765 n. 5 (D.C.Cir. 1987). In such instances, the court is to use traditional tools of statutory construction to ascertain congressional intent.

The question whether or to what extent the Commission may consider economic costs under the Atomic Energy Act in evaluating the implementation of proposed safety improvements to previously licensed power plants is a question of pure statutory interpretation. We therefore turn to traditional tools of statutory interpretation in order to discover congressional intent. In so doing, we find that the answer to this question of statutory construction is clear

—indeed, so clear that even if we were to apply the *Chevron* test, we would never reach its second prong.

### B. *Consideration of Economic Costs Under the Act*

█ In our view, the Act establishes a two-tier structure for protecting the public health and safety. Section 182(a) of the Act commands the NRC to ensure that any use or production of nuclear materials "provide[s] adequate protection to the health or safety of the public." 42 U.S.C. § 2232(a). In setting or enforcing the standard of "adequate protection" that this section requires, the Commission may not consider the economic costs of safety measures. The Commission must determine, regardless of costs, the precautionary measures necessary to provide adequate protection to the public; the Commission then must impose those measures, again regardless of costs, on all holders of or applicants for operating licenses. "Adequate protection," however, is not absolute protection; thus, even when the adequate-protection standard is satisfied, safety improvements will be possible. Section 161 of the Act empowers (but does not require) the Commission to establish safety requirements that are not necessary for adequate protection and to order holders of or applicants for operating licenses to comply with these requirements. In deciding whether to establish and how to enforce such additional requirements, the NRC may take economic costs into account, even to the extent of conducting strict cost-benefit analyses. In sum, the Act precludes the NRC from taxing costs into account in establishing or enforcing the level of adequate protection, but allows the NRC to consider costs in devising or administering requirements that offer protection beyond that level.

To parse out the statutory scheme Congress created for the NRC, we turn first to the adequate-protection standard. We believe that the language of the section containing that standard and the purposes and history of the Act sustain the conclusion that in establishing the appropriate level of regulation under that standard and in enforcing such regulation, the NRC may not consider economic costs. We draw further support for our interpretation from a long-standing decision of the Supreme Court considering the question of whether the NRC may take costs into account in ensuring adequate protection of the public health and safety when issuing an operating license. Finally, we glean support from the Commission's prior interpretation of the adequate-protection standard.

The language of section 182(a) makes no reference to economic costs. Its command is simple and sure: the Commission must provide "adequate protection" of the public health and safety. The inquiry under this section thus appears narrow, focusing solely on health and safety considerations. The statute, of course, does not explicitly preclude the NRC from considering other factors; moreover, the word "adequate" implies some discretion on the part of the Commission, and it might be reasonable to aver that this discretion entails some freedom to consider factors other than health and safety in determining the content of the adequate-protection standard. We therefore cannot say that the words of the statute end our inquiry. We say only that they point toward our ultimate result. *Cf. Union Electric Co. v. Environmental Protection Agency*, 427 U.S. 246, 256–57, 96 S.Ct. 2518, 2525, 49 L.Ed.2d 474 (1976) (holding that the EPA could not consider economic costs in reviewing a state implementation plan under section 110 of the Clean Air Act because a list of considerations in that section did not include costs); *Lead Industries Association v. Environmental Protection Agency*, 647 F.2d 1130, 1148–50 (D.C.Cir.1980) (concluding that economic considerations could play no part in the promulgations of ambient air quality standards under section 109 of the Clean Air Act partly because section 109 "speaks only of protecting the public health and welfare" and "[n]othing in its language suggests that the Administrator is to consider economic" costs). Years before enactment of the Atomic Energy Act of 1946, Congress had passed legislation requiring cost-benefit analysis in agency decision-making. *See* Flood Control Act of 1936, 33

U.S.C. § 701a (1986). Thus, when Congress desired agencies to consider economic costs, it knew how to say so, *see American Textile Manufacturers Institute v. Donovan*, 452 U.S. 490, 510, 101 S.Ct. 2478, 2491, 69 L.Ed.2d 185 (1980); presumably, when Congress desired to permit agencies to consider economic costs, it knew how to say so as well, *see Union Electric*, 427 U.S. at 257 n. 5, 96 S.Ct. at 2525 n. 5. Yet Congress did not express such a desire in the Atomic Energy Act. Congress instead wrote a provision whose language focused solely on public health and safety. Were we to ascribe no meaning to this choice of language, we would ignore our duty to pay close heed to both what Congress said and what Congress did not say in the relevant statute.

The overall focus and purposes of the Act, as reflected in its history, support the conclusion that the Commission may not consider economic costs in ensuring the adequate protection of public health and safety. Congress first passed the Act in 1946, with the declared intention of "direct[ing] the development of atomic energy in such a way as to improve the public welfare, increase the standard of living, ... and promote world peace." S.Rep. No. 1211, 79th Cong., 2d Sess. 1 (1946). To accomplish these objectives, Congress determined to create a governmental monopoly of the production of fissionable materials. The Senate Report explained this choice by stating that "to permit private manufacture of fissionable material would be to permit private manufacture of material of enormous destructive potentialities.... The production of fissionable material is attended by serious hazards to public health and safety. The responsibility for minimizing these hazards is clearly a governmental function." *Id.* at 3. Congress substantially amended the Act in 1954 to provide for the private development of nuclear power. By that time, Congress had become persuaded that the "resources of the Atomic Energy Commission [were] ... [in] adequate to develop atomic-power reactors at a rate consistent with foreseeable technical progress." S.Rep. No. 1699, 83rd Cong., 2d Sess. 3 (1954). At the same time, however, Congress recognized the dangers associated with this approach. The Senate Report, for example, declared that the very technological developments that made a governmental monopoly no longer possible "pose[d] grave threats to the very existence of civilization." *Id.* at 2. In line with this recognition, Congress imposed an expansive and stringent scheme by which the government would regulate every aspect of the new industry. Not a single provision of either the 1954 amendments or any subsequent amendments to the Act provided that the Commission could consider economic costs in administering any of the aspects of this scheme. Not a line in the legislative history accompanying the amendments suggests that such consideration would be appropriate. The concerns and purposes of the drafters to regulate closely a dangerous industry indicate the opposite position.

In addition, exchanges that occurred during congressional consideration of the Energy Reorganization Act of 1974, which abolished the Atomic Energy Commission (AEC) and created the NRC, suggest that Congress, the AEC, and the industry all understood that consideration of economic costs in administering the adequate-protection standard was inappropriate. In the midst of congressional consideration of the Reorganization Act, the Vice Chairman of the industry's Atomic Industrial Forum delivered testimony urging Congress that "the time is ripe to reassess the regulatory process and in fact, probably have an impact statement of changes that are required for safety to show that the added safety is worth the costs in delay and money." III Legislative History of the Energy Reorganization Act of 1974, at 2238 (1974). Representative Holifield responded: "This is a matter that will undoubtedly involve some changes in the Atomic Energy Act. In this particular bill, we are interested in the organizational aspect." *Id.* Similarly, when Senator Ribicoff asked the Director of Regulation of the AEC whether the AEC "ever allow[ed] cost to stand in the way of installing the newest safety and safeguard devices," the Director responded that "the

AEC is charged with assuring the reasonable safety of the facilities it licenses and for that reason, the first decision is made with regard to safety. If it costs additional money, it costs additional money." V Legislative History of the Reorganization Act of 1974, at 3572. Thus, members of Congress, the regulating agency, and the regulated industry all expressed their understanding that the primary health and safety standard of the Act did not allow consideration of economic costs.

Finally, the Supreme Court has indicated that our interpretation of the adequate-protection standard of the Act is proper. In *Power Reactor Development Co. v. International Union of Electrical, Radio, and Machine Workers*, 367 U.S. 396, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961), three unions challenged a Commission decision to issue a construction permit to a power company prior to making a finding that operation of the proposed plant would provide adequate protection to the public health. The Court rejected the challenge, holding that the Commission need not "make the same definitive finding of safety of operation [before it licenses construction] as it ... will have to make before it licenses actual operation of the facility." *Id.* at 398, 81 S.Ct. at 1530. In so holding, the court noted the unions' argument that the Commission could not easily reject a company's application for an operating license if the company already had invested a large amount of money in constructing the plant. The Court responded to this argument as follows:

> The petitioners concede that the Commission is absolutely denied any authority to consider this investment when acting upon an application for a license for operation. [The power company] has been on notice long since that it proceeds with construction at its own risk, and that all its funds may go for naught.... No license to operate may be issued to [the company] until a full hazards report has been filed, until the AEC's Advisory Committee on Reactor Safeguards makes a full investigation and public report on safety to the Commission, [and] until the Commission itself ... has made the safe-

ty-of-operation finding required by § 182 subd. a.... It may be that an operating license will never be issued. If one is, that will not be the end of the matter. The respondents may have judicial review. Moreover, the Commission's responsibility for supervision of [the company] continues.... We hold that the actions of the Commission up to now have been within the Congressional authorization. We cannot assume that the Commission will exceed its powers, or that these many safeguards to protect the public interest will not be fully effective.

*Id.* at 415–16, 81 S.Ct. at 1538–39. The Supreme Court thus held that the Commission could not properly consider the applicant's previous capital investment in deciding whether the operation of a plant would satisfy the adequate-protection requirement. *See also Seacoast Anti-Pollution League v. NRC*, 690 F.2d 1025, 1033 (D.C. Cir.1982) (holding that the Commission "does not and cannot consider the utility's [prior] investment in a particular facility" in determining whether adequate protection exists). We do not overstate the holding of that case: *Power Reactor* does not explicitly articulate the broad principle that the Act prohibits the NRC from considering any kind of economic cost in either setting or administering the adequate-protection standard; the actual holding of the case is narrower and more fact-specific. *Cf.* L. Bickwit, Jr., General Counsel of Nuclear Regulatory Commission, Memorandum to Commissioners, Adequate Protection of the Health and Safety of the Public 7 (October 18, 1979) (arguing that *Power Reactor* should not be read as holding that the Commission may never consider economic costs when making judgments under the adequate-protection standard because "the opinion does not address the question of the extent to which economic or other impacts can be considered either in promulgating safety standards, or in reaching judgments on individual cases with significantly differing fact situations"). Nonetheless, we think that *Power Reactor* supports our interpretation of the statute.

The case indicates that the Supreme Court too viewed the adequate-protection standard as a standard properly divorced from considerations of economic costs.

Indeed, the Commission itself has adopted this broad construction of *Power Reactor* in previous adjudicatory decisions. The most definitive of these decisions is *Maine Yankee Atomic Power Co.*, 6 A.E.C. 1003 (1973). Parties in that case had urged that the Commission conduct cost-benefit analyses in making decisions relating to adequate protection of the public health and safety. The Commission roundly rejected this approach, relying on statutory language, legislative history, and the Court's decision in *Power Reactor:*

> It is difficult to distill the [cost-benefit approach] developed by the Joint Intervenors from such language as "adequate protection to the health and safety of the public".... The decision as to whether a threat to health and safety is posed by any particular activity obviously does entail an assessment of the nature and extent of the risks involved. But the quantum of protection to, or endangerment of, public health and safety is not dependent likewise upon how much benefit will be obtained from the activity. In the present context, a specific nuclear power facility is no safer because it is needed and, by the same token, is no more endangering to health and safety because it is dispensable.

We might be prepared to lay the statutory terminology to one side if there were legislative history reflecting a congressional contemplation that the safety determinations mandated by the Act might, in some circumstances at least, involve a risk-benefit balancing. Our attention has been directed to no such history and, insofar as we have been able to ascertain, there is none.

Nor, to our knowledge, has the Atomic Energy Act or the Commission's regulations ever been so construed, either judicially or administratively.... [A]t no time has it been intimated that factored into the required safety findings must be a judgment as to whether (applying some unspecified standard of measurement) the residual risks can be said to be outweighed by the benefits to be derived from the facility and, therefore, are "acceptable" although they otherwise might not have been. Certainly, *Power Reactor* ... conveys no such thought.

*Id.* at 1006–07. The Commission thus held that the Act prohibited the consideration of economic costs or other factors not related to health and safety in making adequate-protection determinations. *See also Public Service Company of Colorado*, 4 A.E.C. 214, 216 (1969) (stating that the Act does not permit matters of economic feasibility of plant operation to interfere with the "controlling consideration of health and safety"). Indeed, the NRC's general counsel later advised the Commission that *Maine Yankee* "holds that adequate protection under the Act is measured solely by the nature and extent of the risk" and that the Commission would have to overturn *Maine Yankee* to "adopt some balancing test for adequate protection that took into account such things as economic costs and need for power." L. Bickwit, *supra*, at 12, 23. We agree with the construction of the adequate-protection standard that the Commission adopted in *Maine Yankee:* we hold that the Commission may not take economic costs into account in fulfilling its statutory mandate to ensure adequate protection of the public health and safety.

We emphasize that our holding applies both when the Commission determines the content of the adequate-protection standard and when the Commission enforces the standard in individual cases. "Adequate protection" is not a self-defining concept; the Commission must decide the range and scope of safety measures that adequate protection requires. The Commission must then apply the fleshed-out standard to applicants for and holders of operating licenses; the Commission, in other words, must determine whether a nuclear power plant possesses the safety features that the Commission has held necessary to provide adequate protection. Our reading of the statute precludes the consideration of costs at both stages of this process. The Commission must determine the

content of the adequate-protection standard without reference to economic costs; the Commission must then apply that standard to individual applicants and licensees notwithstanding any pleas of poverty. Allowing the consideration of costs at either stage of the process would flout the mandate we have found in the statute—*i.e.,* that the Commission ensure a level of public health and safety without regard to economic costs.

■ The level of adequate protection need not, and almost certainly will not, be the level of "zero risk." This court long has held that the adequate-protection standard permits the acceptance of some level of risk. *See, e.g., Carstens v. NRC,* 742 F.2d 1546, 1557 (D.C.Cir.1984); *North Anna Environmental Coalition v. NRC,* 533 F.2d 655, 665 (D.C.Cir.1976). Our approach coincides with the approach taken by the Supreme Court in *Industrial Union Department, AFL–CIO v. American Petroleum Institute,* 448 U.S. 607, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980), in which the Court construed another statute designed to protect the public safety. The Court wrote:

> "[S]afe" is not the equivalent of "risk-free." There are many activities that we engage in every day—such as driving a car or even breathing city air—that entail some risk of accident or material health impairment; nevertheless, few people would consider these activities "unsafe." [An activity] can hardly be considered "unsafe" unless it threatens ... a significant risk of harm.

*Id.* at 642, 100 S.Ct. at 2864. Similarly, under the adequate-protection standard of section 182(a), the NRC need ensure only an acceptable or adequate level of protection to public health and safety; the NRC need not demand that nuclear power plants present no risk of harm.

If it so desires, however, the Commission may impose safety measures on licensees or applicants over and above those required by section 182(a)'s adequate-protection standard. As we have noted, section 161 of the Act empowers the Commission to issue rules, regulations, or orders to "pro-

tect health or to minimize danger to life or property." 42 U.S.C. § 2201(b), (i). This section cannot be read simply to permit the Commission to provide adequate protection; another section of the Act *requires* the Commission to do that much. We therefore must view section 161 as a grant of authority to the Commission to provide a measure of safety above and beyond what is "adequate." The exercise of this authority is entirely discretionary. If the Commission wishes to do so, it may order power plants already satisfying the standard of adequate protection to take additional safety precautions. When the Commission determines whether and to what extent to exercise *this* power, it may consider economic costs or any other factor. The Commission, after all, need not exercise the authority granted by section 161 at all; given this fact, the Commission certainly may use cost-benefit analysis to decide whether exercising the authority conferred by section 161 makes economic or policy sense.

The Atomic Energy Act thus erects a two-tier structure relating to the protection of public health and safety. Under section 182(a) of the Act, the Commission must ensure that plants provide adequate protection of the public health and safety; in establishing and enforcing the level of adequate protection, the Commission may not consider economic costs. Under section 161 of the Act, the Commission may order plants to provide "extra-adequate" protection; in deciding whether to establish or enforce such requirements, the Commission may take into account economic costs. Using this explication of the structure and meaning of the Act, we turn to consider whether the Commission's rule on backfitting at issue in this appeal conforms to the provisions of the Act.

## C. *Consideration of Costs Under the Rule*

As we have noted, the Commission's backfitting rule generally requires the Commission to perform a multi-factor analysis of a proposed backfit, which includes consideration of the backfit's costs.

Under the rule, the Commission may order a backfit analyzed in this manner only if the added protection to public health and safety resulting from the backfit justifies the costs of implementation. The rule, however, lists three situations in which the multi-factor analysis is not required and the cost-justification standard does not apply. One of these situations is described in a footnote to the rule; it essentially states that the cost-justification standard will not apply when the proposed backfit is to "ensure that the facility poses no undue risk to the public health and safety." 10 C.F.R. § 50.109(a)(4)(ii) n. 3.

We conceivably could read the terms of this rule to comply with the statutory scheme we have described above. The Commission, as we have noted, frequently has used the phrase "no undue risk" to refer to adequate protection. The rule thus might be read to except all backfits necessary to ensure adequate protection from the rule's provisions. The rule does not state, but we might imply, that it contemplates that the Commission *will* in all circumstances (and regardless of cost) order backfits of this kind. Two assertions in the Statement of Considerations accompanying the rule—first, that "[t]he consideration and weighing of costs contemplated by the rule applies to backfits that are intended to result in incremental safety improvements for a plant that already provides an acceptable degree of protection," 50 Fed.Reg. 38,103, and second, that "[t]he costs associated with proposed new safety requirements may be considered by the Commission provided that the Atomic Energy Act 'no undue risk' can be made," *id.* at 38,101—could support this interpretation.

Statements that the Commission has made in promulgating the rule and in defending it before this court, however, disincline us from interpreting the rule in this fashion. As we have noted, in the Statement of Considerations accompanying the rule, the Commission states that "there is no intent on the part of the Commission to include within the scope of th[is] exception new or modified interpretations of what constitutes no undue risk to the public health and safety." *Id.* at 38,103. In the brief submitted to this court, the Commission confirmed this statement:

> In short, cost is not a consideration in *meeting* the "no undue risk" standard. But in *setting* any such new standard, the rule's cost-benefit analysis requirement would apply. For example, if the Commission were to consider changing the meaning of "no undue risk" to reduce the overall risk level of regulated activities still further, the Commission would determine whether the costs to licensees of adapting to such a new standard would be justified by the benefits for public health and safety. But once the new standard was established, licensees would not be excused from meeting it for reasons of cost.

Brief for Respondents at 25–26 n. 11; *see id.* at 15 n. 7. This statement unequivocally shows that the Commission understands its own rule to allow the consideration of costs in the *establishment* of the adequate-protection standard. We already have held that such consideration is forbidden by the statute. Hence, the Commission's own construction of the backfitting rule conflicts with the Act by injecting cost considerations into the very core of the adequate-protection standard.

█ We think that the vulnerability of the rule to this and other impermissible interpretations compels our vacating the rule. In our view, the backfitting rule is an exemplar of ambiguity and vagueness; indeed, we suspect that the Commission designed the rule to achieve this very result. The rule does not explicate the scope or meaning of the three listed "exceptions." The rule does not explain the action the Commission *will* take when a backfit falls within one of these exceptions. In short, the rule does not speak in terms that constrain the Commission from operating outside the bounds of the statutory scheme. We think that the Commission must be more faithful to the statutory provisions it has the responsibility to apply. Specifically, we think that the Commission must adopt a rule that tracks the requirements of the Atomic Energy Act. The Act prohibits the Commission from considering

costs in setting the level of adequate protection and requires the Commission to impose backfits, regardless of cost, on any plant that fails to meet this level. The Act allows the Commission to consider costs only in deciding whether to establish or whether to enforce through backfitting safety requirements that are not necessary to provide adequate protection. Any future rule adopted by the Commission should explicitly recognize and comply with this statutory scheme.

Because we find that the rule's treatment of economic costs demands that we vacate the rule in its entirety, we do not reach petitioners' other challenges to aspects of the rule. We also do not reach petitioners' particular objections to the procedures contained in Manual Chapter 0514. The procedures in that chapter are inextricably intertwined with the provisions of the final rule: the procedures closely track the rule's substantive commands. We therefore vacate the manual chapter for the same reason that we vacate the backfitting rule.

### III. Conclusion

The language and legislative history of section 182(a) reflect a dominant concern for public health and safety. This focus is hardly surprising given the nature of the activities under regulation. Nuclear power was at the time of the section's enactment and remains today fraught with the potential for great danger to human life. Congress thus limited the discretion of the Commission in carrying out the mandate to ensure adequate protection of the public health and safety. Congress left no room for the Commission, when operating within this sphere, to use cost-benefit analysis. Because the Commission's rule allows the Commission to consider costs under the adequate-protection standard, and therefore expands beyond the bounds of the

statute the Commission's authority and discretion, the rule does not pass muster.

*It is so ordered.*

WILLIAMS, Circuit Judge, concurring:

There is no dispute between petitioners and the Commission on the scope of § 182(a) of the Atomic Energy Act (the "Act"), 42 U.S.C. § 2232(a) (1982); I decline to join the court in its extended dictum on the subject. I do, however, join those portions of the opinion holding that, apart from its duty to set standards providing "adequate protection" under § 182(a), the Commission may, under § 161(i), 42 U.S.C. § 2201(i) (1982), (1) impose still more stringent standards upon nuclear power reactors and (2) consider cost in determining the appropriate level of those standards. I also join the remand to the agency for it to clarify the relationship between cost-independent standards, which the Commission purports to rest on § 182(a), and cost-dependent standards grounded on § 161(i).[1]

### I. The Absence of Dispute Over § 182(a)

In this litigation the Commission takes the position that under § 182(a) it disregards cost in setting standards aimed at achieving "adequate protection to the health and safety of the public."[2] It defends those portions of the challenged rule that permit consideration of cost *solely* on the basis of § 161(i), which supplies general authority to take steps necessary "to protect health and to minimize danger to life or property." Under this authority, it argues, it may "impose backfits below the statutorily required minimum of 'adequate protection' to the public health and safety. 42 U.S.C. § 2232(a)." Brief for Respondents in No. 85–1757 at 4; *see also id.* at 5.

Petitioners staunchly resist this interpretation of § 161(i). They argue that no provision whatever of the Atomic Energy Act authorizes the Commission to impose cost-dependent standards. Speaking of the

1. I do not believe that the challenges to the procedures of Manual Chapter 0514 are ripe.

2. It is not clear whether the Commission has adopted the view that costs are irrelevant under

§ 182(a) as *the* correct interpretation of that section, or simply as its present choice among possible lawful interpretations. Resolving the distinction is unnecessary here.

NRC brief, petitioners summarize it as contending that "the first standard [under § 182(a)] is used in establishing adequate safety standards and the second [under § 161(i)] authorizes the Commission to go beyond what is adequate and order additional measures.... NRC cites no legislative history nor any case which ever mentions or applies this alleged secondary standard." Reply Brief for Petitioners at 5. Thus the question posed by the parties is whether the Commission enjoys a power under § 161(i) to impose cost-dependent standards more stringent than those imposed under § 182(a).

But issue is not joined on whether cost may be considered under § 182(a). While petitioners contend that if the Commission based cost-dependent standards on § 182(a), it would be acting illegally, the Commission declines to invoke that section. Thus the Commission makes no defense of the proposition that petitioners attack.

The court's offering of dictum on this subject seems to me borrowing trouble. One can imagine scenarios in which total blindness to cost under § 182(a) could be hazardous to the nation's health. Suppose that a particular protective measure had a modest but non-trivial potential for saving lives; that this measure would be very costly; that non-nuclear energy supplies were far more scarce than now (and thus far more costly); and that the energy scarcity resulting from non-use of nuclear power would inflict macroeconomic shocks more severe than those of the 1970s. I should think that such economic costs would bear upon what level of protection was adequate. Lives lost because of inadequate energy supplies and economic dislocations could outnumber lives potentially saved by the protective measures.

Happily, such a scenario appears remote. It seems probable that we can have our cake and eat it: adequate energy supplies, protection of public health and safety that is not merely adequate but ample, and freedom from catastrophic economic burdens. Enjoying this luxury, it is easy to say that the Commission must disregard economic cost in setting the § 182(a) standard; in circumstances that are quite imaginable but luckily neither present nor apparently on the horizon, the Act would under the majority's dictum operate as a virtual "suicide pact." *See Terminiello v. Chicago*, 337 U.S. 1, 37, 69 S.Ct. 894, 911, 93 L.Ed. 1131 (1949) (Jackson, J., dissenting). Of course Congress would be free to amend the Act; but there is simply no need in the present case to explore the precise scope of § 182(a) since the Commission places no reliance on that section for its consideration of cost in the backfit context.

Equally unnecessary is the dictum dispatching *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The Supreme Court's dicta in *Immigration and Naturalization Service v. Cardoza-Fonseca*, —— U.S. ——, 107 S.Ct. 1207, 1220–22, 94 L.Ed.2d 434 (1987), provide no warrant for unceremoniously dumping our rule of deference to reasonable agency interpretations in areas of statutory ambiguity. As Justice Scalia pointed out in his concurrence to *Cardoza-Fonseca*, the majority found the INS's interpretation of the statutory language at issue "clearly inconsistent with the plain meaning of [the language] and the structure of the Act." *Id.* at 1224. Thus under *Chevron* there was no occasion for deference. Despite some vague language in *Cardoza-Fonseca*, I doubt that the Court intended the radical limit on *Chevron* that the majority here proposes.

## II. AUTHORITY UNDER § 161(I) TO IMPOSE COST-DEPENDENT SAFETY STANDARDS

The court correctly dismisses petitioners' argument that no provision of the Act allows the Commission to take cost into account in setting standards for nuclear reactors. Petitioners' view—that provisions of the Act homogeneously preclude consideration of cost—would lead to astonishing and perverse results. Consider the dilemma that would be posed by a technological innovation that (1) can increase safety, (2) is cheap to build into reactors so long as the builders are aware of the need before construction starts, and (3) is not cost-justified in operating plants (because of the

higher costs of backfitting). (It seems probable that many innovations would roughly meet these criteria.) Petitioners' view would impose a cruel dilemma on the Commission. If it required the innovation for future plants, it would be forced to require it for operating ones, even though the benefits of the installation in operating ones would not (by hypothesis) justify the costs and even though, indeed, this insistence might force the decommissioning of such plants. On the other hand, if the Commission failed to insist on the innovation, new plants' workers and neighbors would be deprived of safety gains that amply justify the costs (again, by hypothesis).[3] The court here rightly refuses to find in the Act any such straitjacket.[4]

### III. REMAND TO THE COMMISSION

In developing the Rule and Statement of Considerations, the Commission has employed loose terminology that obscures the line between cost-dependent and cost-independent standards. Particular confusion arises from the comment (in the Statement) that "there is no intent on the part of the Commission to include within the scope of [the exceptions from the Rule's provision for consideration of cost] new or modified interpretations of what constitutes no undue risk to the public health and safety."

50 Fed.Reg. 38,103. As the Commission has generally used the phrase "no undue risk" to characterize conditions affording "adequate protection" to public health and safety, this may be read to mean that when the Commission by way of re-interpretation changes the safety levels necessary for "adequate protection," it will not enforce those levels in the backfit context unless they prove cost-justified. Superficially that appears inconsistent with its view that it assigns a cost-independent meaning to "adequate protection." Perhaps the two can be reconciled. For example, the Commission may uncouple the concepts of "no undue risk" and "adequate protection." But the Commission has appeared inconsistent and thus wanting in "reasoned decision-making." *See, e.g., Motor Vehicle Manufacturers Ass'n of the United States v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 52, 103 S.Ct. 2856, 2871, 77 L.Ed.2d 443 (1983). Accordingly I join in remanding to the Commission.

---

**3.** Firms owning nuclear plants might not adopt cost-effective safety devices without Commission pressure because the incentives provided by tort liability could be materially diluted by, for example, potential bankruptcy relief and statutory limitations on liability.

**4.** A more conventional approach would be to find in § 182(a) authority to impose both a minimum level of safety without regard to cost and an extra level arrived at in light of cost, and to view § 161(i) as merely authorizing regulations implementing these standards. The Commission, however, has abjured § 182(a) as the basis for its cost-dependent standards, and its finding of the necessary power in § 161(i) is neither precluded by the statutory language nor unreasonable.